# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF ILLINOIS.

126 9
37a 225
37a 245
:126 9
,141 215

## NEWTON WATT

### *v.*

### THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa October 2, 1888.*

1. CRIMINAL LAW—*of the venue—place of trial.* Whenever the *locus in quo* of an offense can be precisely identified and shown, under section 4, division 10, of the Criminal Code, the accused must be indicted and tried in the county in which the offense was committed. But when it can not be shown with certainty in which of two counties a crime has been committed, as, when it was committed upon a railway train while in motion, the accused may be tried and convicted in either of the two counties.

2. While at common law, and under the rule established by both our former constitutions, criminal offenses were regarded as strictly local, and subject to prosecution only in the counties in which they were committed, the present constitution vests in the General Assembly the power to change that rule to such extent as that body may see proper. The General Assembly may now determine, by law, when offenses are to be deemed to be local, and when and within what limitations they are to be treated as transitory.

3. Under the provision of the present constitution that "in all criminal prosecutions the accused shall have the right to * * * a speedy public trial by an impartial jury of the county or district in which the

offense is alleged to have been committed," a prosecution may now be had in the county in which the offense is alleged in the indictment to have been committed.

4. Where the crime charged has been committed under such circumstances as to render it doubtful in which of two counties it took place, the prosecution may be properly instituted in either one of such counties, and the indictment may properly allege its commission in either county. In such case, proof of the commission of the offense in one or the other of those counties, but under circumstances which make it doubtful or difficult to determine in which of them, is sufficient proof of the allegation that it was committed in the county named.

5. SAME—*reasonable doubt—whether properly defined.* On the trial of one upon the charge of murder, the court instructed the jury, "that the doubt under the influence of which the jury should frame a verdict of not guilty, must always be a reasonable one. A doubt produced by undue sensibility in the mind of any juror in view of the consequences of his verdict, is not a reasonable doubt, and a juror is not allowed to create sources or materials of doubt by resorting to trivial and fanciful suppositions, and remote conjectures as to possible states of facts differing from those established by the evidence. You are not at liberty to disbelieve as jurors, if, from the evidence, you believe as men. Your oath imposes on you no obligation to doubt where no doubt would exist if no oath had been administered:" *Held,* that the instruction announced a correct proposition of law.

6. SAME—*omission of accused to testify in his own behalf—remarks thereon by the prosecution.* It is the duty of the trial court, in all criminal trials, when the defendant does not testify in his own behalf, to see that no allusion is made to that fact by the prosecution. Indirect and covert references to the neglect of the defendant to testify, may be as prejudicial to his rights as a direct comment upon such neglect.

7. But it does not necessarily follow that every reference to the law on that subject is prohibited. The true test is, was the reference intended or calculated to direct the attention of the jury to the defendant's neglect to avail himself of his legal right to testify.

8. On the trial of two persons upon the charge of murder, in a case where the evidence was circumstantial, one of the counsel for the defense, in argument, stated the fact that one of the defendants had testified. Counsel for the prosecution, in his remarks, said: "My associates who preceded me, spoke of circumstantial evidence. They told you, and truthfully, too, that mis-convictions and mis-trials on circumstantial evidence occurred almost entirely in the dark ages, when prisoners were not allowed counsel in open court,—when prisoners could not testify on their own behalf." On objection, the court stated that the remark should not have been made: *Held,* that the remark of counsel having been

made to illustrate another topic, was not of such gravity as to call for a reversal of a judgment of conviction.

9. EVIDENCE—*conversations with one to be affected thereby—or statements made in his presence.* Declarations or statements made in the presence of a party are received in evidence, not as evidence in themselves, but to understand what reply the party to be affected should make to them. Even if he makes no reply, the statement is still admissible, upon the principle that if a party is silent when he ought to have replied, the presumption of acquiescence arises. And the same rule applies in criminal cases.

10. On the trial of one upon a charge of murder, a witness was allowed to testify, for the prosecution, to two conversations with the accused, concerning the matter charged, in the last of which he told the accused his prior statement was not probable, or even credible, giving his reasons why no one would believe the defendant's statements, to which the accused replied, "Well, I can't help it; it is true,"—which was objected to: *Held,* no error in the admission of the evidence of such conversation.

11. SAME—*opinion of witness.* On the trial of two defendants on a charge of murder, in the commission of which the facts showed a violent struggle with the deceased, two witnesses were shown some hair found in the hands of the deceased, and also a lock of his hair, and they were permitted to testify that the two specimens exactly resembled each other. The hair of the two defendants was almost black, while that found in the hands of the deceased was light brown in color, and there was no pretense that such hair came from either of the defendants: *Held,* that while the evidence was incompetent, being no case for expert testimony, its admission was harmless error, and not such as to require a reversal.

WRIT OF ERROR to the Circuit Court of Grundy county; the Hon. DORRANCE DIBELL, Judge, presiding.

Mr. A. R. JORDAN, for the plaintiff in error, contended that the facts were not sufficient to convict Watt, and reviewed the evidence, and commented thereon.

The statute authorizing the trial of a defendant for a crime out of the county where committed, is in violation of section 9, article 2, of the State constitution. *Buckrice* v. *People,* 110 Ill. 29; *State* v. *McGraw,* 87 Mo. 161; *Ex parte Slater,* 72 id. 106; *State* v. *Lawrence,* 12 Ore. 297.

The court erred in allowing Withrow to testify to what he told Watt as to the general belief of his guilt, and the improbability of his story. *Devine* v. *People,* 100 Ill. 291.

The court erred in allowing the experts to testify as to the similarity of the hair found in Nichols' hands, with that taken from his head. *State* v. *Knoll,* 55 Wis. 250.

There was error in the remarks of counsel for the People in alluding to the fact that Watt failed to testify. *Campbell* v. *People,* 109 Ill. 565; *Austin* v. *People,* 102 id. 261.

The People's instructions are erroneous in selecting certain, parts of the evidence and giving them undue prominence. The twenty-sixth instruction, in regard to a reasonable doubt, is clearly bad. *Anderson* v. *People,* 41 Wis. 430.

Mr. O. N. CARTER, State's Attorney, Mr. S. C. STOUGH, and Mr. R. M. WING, for the People, contended that the verdict is supported by the evidence, which they reviewed and discussed at considerable length.

At common law, when the blow was inflicted in one county and death ensued in another, the venue might be laid in the latter. 1 Russell on Crimes, (8th ed.) 548, sec. 6; *State* v. *Pauley,* 12 Wis. 599.

Nearly every State has enacted that the trial may be had in either county, and such enactments are valid. *Tippins* v. *State,* 14 Ga. 422; *State* v. *Pauley,* 12 Wis. 599; *Commonwealth* v. *Parker,* 2 Pick. 550.

As to the effect of improper remarks by counsel to the jury, see *Wilson* v. *People,* 94 Ill. 299; *Garrity* v. *People,* 107 id. 163; *Spies* v. *People,* 122 id. 1.

There was no error in the admission of the testimony of Withrow. The case of *Devine* v. *People,* 100 Ill. 291, is not in point.

The instruction relating to reasonable doubt is taken from *Commonwealth* v. *Hannan,* 4 Pa. St. 272, and is identical with one approved in *Spies* v. *People,* 122 Ill. 1.

Mr. GEORGE HUNT, Attorney General, also for the People.

Mr. JUSTICE BAILEY delivered the opinion of the Court:

At the March term, 1887, of the circuit court of Grundy county, Henry Schwartz and Newton Watt were jointly indicted for the murder of Kellogg Nichols. The indictment, as presented by the grand jury, consisted of seven counts, of which the seventh was quashed on motion of the defendants, and upon the remaining six counts the defendants were tried and convicted, and sentenced to imprisonment in the penitentiary for life. Watt alone has brought the record to this court, and assigned errors.

The first, third, fourth, fifth and sixth counts of the indictment are in the usual form, alleging the commission by the defendants of the crime charged on the 13th day of March, 1886, in Grundy county, and differing from each other only in their statements as to the instrument used, and the mode in which the homicide was perpetrated. The second count alleges that the murder was committed by the defendants on said 13th day of March, 1886, "in and upon a railroad car passing over the Chicago, Rock Island and Pacific railway, a railroad in the State aforesaid, which said car came into said county of Grundy and State aforesaid, on the day aforesaid."

It appears from the evidence that Nichols, at the time he was killed, was an express messenger in the employ of the United States Express Company, and that his usual route was over the Chicago, Rock Island and Pacific railway, from Chicago, through Will and Grundy counties, to Davenport in the State of Iowa. The train of cars on which he was acting as messenger at the time of his death left Chicago at 11 o'clock P. M. on the 12th day of March, 1886. At 12:45 A. M. of March 13, it reached Joliet in the county of Will, and there Nichols was seen alive and in the discharge of his duties. When the train reached Morris in the county of Grundy about three-quarters of an hour later, he was found lying on the floor of the baggage car in which he was riding, dead, having a large number of contused wounds on his head, face and hands, and

his right arm broken at the wrist, having a bullet wound in his neck, another through the shoulder and a third through his left arm, and having a very severe wound on his left temple inflicted with an iron rod or poker, the last mentioned wound being necessarily fatal, and having probably produced death almost instantly.

The murder was perpetrated, as the evidence clearly shows, in pursuance of a plan on the part of the murderers to rob the express safe then in the custody of Nichols, and containing at the time $21,500 in money. Of this sum, $20,000 was in one package consigned by the Merchants' National Bank of Chicago to the Citizens' National Bank of Davenport, and made up of four smaller packages of $5,000 each, all in $50 and $100 bills. The remaining $1500 was in three separate packages of $500 each. Beside the money, the safe contained several packages of cancelled vouchers and a quantity of watch springs. The train at the time consisted of the engine, a number of passenger coaches, and two baggage cars, the baggage cars being cars number 18 and 34, number 18 being placed next to the engine, and number 34 in the rear of and next to number 18. The dead body of Nichols was found lying on the floor of car number 18. The safe was in car number 34, and after the train reached Morris, it was found that it had been unlocked and the money stolen, and the residue of its contents scattered on the floor of the car. A subsequent examination of the inside of the lock disclosed marks or scratches, indicating that an unsuccessful attempt had been made to unlock the safe by means of a wire or other similar instrument, and the evidence tends to support the theory that the robbers, after vainly attempting to get possession of the money in that way, went into the other car for the purpose of obtaining the key from Nichols; that a desperate struggle ensued, resulting in Nichols' death, and that the robbers, having possessed themselves of the key, returned to the safe, opened it, and took out the money, leaving the key in the lock.

The line dividing Will and Grundy counties is about midway between Joliet and Morris. No witness saw the homicide, and it is impossible to determine from the evidence, whether it was committed while the car was in the county of Will or after it had crossed the line into the adjoining county of Grundy. The first question presented by the assignments of error is, whether, under these circumstances, the circuit court of Grundy county had jurisdiction of the offense.

By section 4, division 10, of the Criminal Code, it is provided that, "the local jurisdiction of all offenses not otherwise provided for by law, shall be in the county where the offense was committed." Section 6 of the same division provides that, "if the party killing shall be in one county and the party killed be in another county at the time the cause of death shall be administered or inflicted, or if it is doubtful in which of several counties the cause of death was administered or inflicted, the accused may be tried in either county." Section 11 is as follows : "Where any offense is committed in or upon any railroad car passing over any railroad in this State, or on any water-craft navigating any of the waters within this State, and it can not readily be determined in what county the offense was committed, the offense may be charged to have been committed and the offender tried in any of the counties through or along or into which such railroad car or water-craft may pass or come, or can reasonably be determined to have been, on or near the day when the offense was committed."

It is manifest that the provisions of either the 6th or 11th sections of the statute above quoted are broad enough to cover the present case. The cause of death was inflicted in either Will or Grundy county, but in which the evidence leaves it wholly in doubt. The offense was committed on a railroad car passing over a railroad in this State, and while it is shown to have been committed in one of two counties through which the car passed, it is impossible to determine in which with any degree of certainty. But it is insisted that the constitu-

tion secures to every person accused of a criminal offense the right to a trial by an impartial jury of the county in which the offense was committed, and that the foregoing sections of the statute, being in derogation of that constitutional right, are void. At common law all criminal offenses are deemed to be local and subject to prosecution only in the county where they were committed. In the early ages of English jurisprudence jurors who were impanelled to try either civil or criminal causes were themselves the witnesses, and rendered their verdicts upon their own knowledge, and therefore, in order that they might be qualified to perform their functions, they were summoned from the *visne* or neighborhood of the place where the matter to be tried arose. When at a later period they were required to find their verdicts upon the evidence of witnesses, it was still deemed important that they should come from the place where the witnesses lived and where the dispute originated, since jurors from the *visne* or neighborhood were regarded as more likely to be qualified to investigate and determine the truth than persons living at a distance from the scene of the transaction. It thus became a settled rule of the common law that persons accused of criminal offenses should have a right to be tried by a jury of the *visne* of the alleged crime. Though originally more limited, the *visne* or neighborhood came to be understood to be the county where the offense was committed, and such was its signification at common law at the time that system of jurisprudence was adopted in this State. 1 Chitty's Crim. Law, 177; 3 Reeve's Hist. of Eng. Law, 476; 4 Black. Com. 349.

Undoubtedly the right to a trial by a jury of the county in which the crime charged was committed is ordinarily a substantial and important legal right. It secures to the accused a trial among his neighbors and acquaintances, and at a place where, if innocent, he can most readily make that fact to appear. But it is difficult to see how that can be the case where the offense is committed on a railway train, and the circum-

stances are such that it can not be definitely located in any one of several counties through which the train passes. Those who are on the train are for the time being completely segregated from the communities through which they are rapidly passing, and there is ordinarily no circumstance which can make it more advantageous for a person accused of such crime to be tried in one county than in another. The right in such case to a trial in a particular county, if it exists at all, is at best a technical right, having no substantial importance or value to the accused.

Whenever the *locus in quo* of the offense can be precisely identified, under the provisions of the section of the statute first above quoted, the trial should of course be had in the county where it was committed, but when such is not the case a somewhat different rule must be applied or the offender can not be tried at all. When it can not be determined in which of two or more counties the criminal act was perpetrated, the offender must, *ex necessitate*, be tried in a county which can not be proved beyond a reasonable doubt to be the actual *visne* of the crime. If he can not be so tried the law is powerless to punish him. The evidence of his guilt may be never so conclusive, but because of the impossibility of proving upon which side of an imaginary line the swiftly moving train happened to be at the instant the homicidal blow was struck, the murderer must be given complete practical immunity from all the penal consequences of this heinous offense. No court should adopt a construction of the law which would involve consequences of this character unless forced to do so by considerations which are insurmountable.

The phraseology of that section of our present constitution which relates to the place of trial in criminal prosecutions differs materially in one respect from that of the corresponding provisions of the constitutions of 1818 and 1848. The constitution of 1818 provided that, in all criminal prosecutions, the accused should have a right to "a speedy public trial

by an impartial jury of the vicinage;" and the constitution of 1848 provided that he should have a right to "a speedy public trial by an impartial jury of the county or district wherein the offense shall have been committed." It must be admitted, probably, that both these constitutional provisions were susceptible of but one construction, viz., that of limiting jurisdiction in all criminal prosecutions absolutely to the county where the crime alleged was actually committed. The framers of our present constitution, recognizing, as we may assume, the infirmity of this rule, particularly in its application to cases like the present where it is impossible to determine in which of two or more counties a particular crime was committed, revised the section so as to make it read as follows: "In all criminal prosecutions the accused shall have a right to * * * a speedy public trial by an impartial jury of the county or district in which the offense *is alleged* to have been committed." This modified phraseology may fairly be regarded as evidencing an intention to relax in some degree the rigid rule formerly prevailing. The prosecution may now be had in the county where the offense is *alleged* to have been committed. The allegation here referred to is doubtless that made by the indictment, that being the only document in which the proper allegations as to the vicinage of the crime are ordinarily made. The constitution then may be regarded as empowering the General Assembly to provide, in its discretion, for the presentment of indictments in which the allegation as to the vicinage of the offense may not be in accordance with the actual fact. If this is not so, the words inserted in the present constitution are meaningless, and the instrument must be interpreted precisely as though they had not been used.

While at common law and by the rule established by both our former constitutions criminal offenses were regarded as strictly local, and subject to prosecution only in the counties where they were committed, our present constitution vests in the General Assembly the power to change that rule to such

extent as it may see proper. It may now determine by law when offenses are to be deemed to be local, and when and within what limitations they are to be treated as transitory. The General Assembly has accordingly, in the first section of the statute above quoted, established the general rule that jurisdiction of criminal offenses shall be local, unless otherwise provided by law, and in the other sections quoted provision is made for the cases where it is doubtful or can not be readily determined in which of several counties the offense is committed, and there, as between such counties, the offense is made transitory.

The crime charged in the indictment in the present case having been committed under circumstances which render it transitory as between Will and Grundy counties, the prosecution was properly instituted in Grundy county, and the offense is properly alleged to have been committed in that county. Proof of the commission of the offense in one or the other of those counties, but under circumstances which make it doubtful or difficult to determine in which, is sufficient proof of the allegation that it was committed in Grundy county. It is unnecessary for us to determine whether the second count of the indictment, in which the fact that the homicide was committed on a railroad car passing over a railroad in this State and coming into Grundy county is specially pleaded, is sufficient to sustain the conviction or not, as the other five counts are clearly sufficient, and their allegation as to the venue of the crime is sustained by sufficient and competent evidence. The instruction given by the court to the jury at the instance of the prosecution, as to what would constitute legal proof of the allegation as to the venue, was entirely in harmony with the views we have expressed, and was, as we think, properly given.

The evidence upon which the defendants were convicted is purely circumstantial, and it is strenuously urged that, so far as it applies to defendant Watt, it is insufficient to sustain the verdict of guilty. It must be admitted that the case made

against the other defendant is stronger and more conclusive than that made against Watt, but after giving to the record that careful and patient consideration which the importance and gravity of the case demand, we are unable to say that, even as to him, the verdict is not the fair and proper result of all the evidence in the case. The record is very voluminous, and any attempt to state in detail all the various circumstances proved, or to group and array them in such relation to each other as to present their full and proper criminative force, would far transcend the reasonable limits of an opinion. We must therefore content ourselves with referring briefly to some of the more general features of the evidence.

At the time of the homicide Schwartz and Watt were both in the employ of the Chicago, Rock Island and Pacific Railway Company as brakemen, and had for a considerable time been acting in that capacity on the same train on which Nichols was running as express messenger, Watt having the position of head-brakeman and Schwartz that of rear-brakeman. On the night in question and about two hours prior to the time for the departure of the train from Chicago, it was ascertained that Rumsey, the baggage-man, had been taken suddenly ill, and his place was thereupon temporarily supplied by placing Watt in charge of the baggage and giving Schwartz the position of head-brakeman and one Johnson that of rear-brakeman. The end doors of the baggage cars in use by said railway company had spring locks which could be opened from the inside by merely turning a knob, but which could be opened from the outside only by the use of a key, and said doors were also supplied with various other inside fastenings which, if properly used, rendered it impossible for any person to enter the car from the platform without the permission of the baggage-man, and a rule of the company required all baggage-men to keep the doors thus fastened while the train was in motion, but there is some evidence tending to show that this rule was not at all times rigorously enforced. After Watt and Schwartz

were assigned their positions and before the train left Chicago, they were seen together in the baggage car in private conversation. The next seen of Watt, so far as the evidence discloses, was at Joliet, where he was observed passing from one of the baggage cars to the other. After the train left Joliet Schwartz made repeated inquiries of the conductor, and took unusual pains to ascertain, whether any passengers were to be let off at Minooka, a station midway between Joliet and Morris, at which the train was not accustomed to stop. As the train reached Morris the conductor alighted, and was immediately hailed by Watt who was then standing near car 34 and appeared greatly excited and frightened, and was told by him that somebody had been in the car and that the safe had been opened and the papers scattered over the floor. As the conductor sought to enter the car Watt exclaimed against his doing so. He went in however followed by both Watt and Schwartz and after noticing the condition of things there, he asked Watt where the messenger was, to which the latter replied that he did not know as he had not seen him since leaving Joliet. The doors opening on to the platform between the two cars were shut. The conductor passed into car 18, opening the door of that car with his key, and found a pool of blood near the door, and the body of Nichols lying on the floor near the opposite end of the car. Hanging up in its usual place was found the poker belonging to the car, consisting of an iron rod about one-half inch thick and about three feet in length, and having on one end of it blood and small pieces of bone. Traces of blood were found in various parts of the car, and a line of blood drops led from the pool of blood to the place where the body was found lying.

Watt, according to his own admission, was in car 34 at the time the safe was robbed. The account of the affair given by him to the conductor at the time and to others subsequently was, in substance, that, about five minutes after the train whistled for Minooka, as he was sitting on a trunk on the

north side, and towards the east end of the car facing east-
wardly, and while he was there engaged in making out his trip
report, he heard a slight noise of a foot-step behind him, and
turning partly around, he saw a revolver over his shoulder and
heard a voice which said, "If you open your mouth I will kill
you." Just at that instant two of the transoms in the roof of
the car, on the side opposite to the one where he was sitting
were broken and a hand holding a revolver was thrust through,
and the man behind him, pointing to the hand, said, "The man
on top of this car will watch you;" or, "That man has got the
drop on you." As he partly turned around he caught a glimpse
of the man behind him, and saw that he had something over
his face. He then heard behind him the sound of the tearing
of papers, and soon after the man came towards him and
warned him not to move until the train stopped at Morris.
He sat still until the train slowed up for Morris and then
glanced up and saw that the hand at the transom had disap-
peared and that the man in the car was gone, but he did not
hear him come in or go out, and could not tell when he left.
This account of the affair, with some variations in minor par-
ticulars, was repeated by Watt to various parties and was
adhered to by him down to the time of the trial.

When the train left Morris Schwartz took Nichols' place
and performed his duties from there to Davenport. After
arriving at Davenport he manifested a strong desire to return
to Chicago as quickly as possible, and without waiting for the
return trip of his own train, he took passage by one leaving
earlier, and there volunteered to take the place and perform
the duties of one of the brakemen, and insisted that such
brakeman should retire to bed, which he did. On the way to
Chicago the conductor discovered in the closet of the passenger
coach in which Schwartz was principally employed, the frag-
ments of a cheap new satchel which some one had evidently
been trying to secrete and destroy; and lying on the floor
among the fragments was found a small piece of paper which

proved to be a part of one of the cancelled vouchers which were in the express safe at the time of the robbery.

The most important evidence against both Schwartz and Watt, however, is to be derived from their subsequent conduct and statements. Schwartz, very soon after the robbery, changed his mode and style of living and indulged in extravagant expenditures which were wholly out of keeping with his honest resources and visible means of acquiring money. As a part of his expenditures he is shown to have paid out to various parties a considerable number of $50 bills. These facts, together with various statements and admissions made by him in conversations with different witnesses, but which we need not here rehearse in detail, show conclusively that shortly after the robbery, he was in possession of a very large sum of money, made up of $50 and $100 bills, and also prove beyond a reasonable doubt that said money was the identical money stolen from the express company.

The evidence shows that from the date of the robbery down to the time of the trial the intimacy between Schwartz and Watt was close and their private interviews frequent. Watt seems not only to have been aware of Schwartz's possession of said money, but to have aided him in secreting it. A marked alteration is shown to have taken place in the circumstances and ideas of both. They began to speak of new employments which would require the investment of considerable sums of money, and to express contempt for the salaries they were receiving from the railway company, and both, by way of seeking to give color and plausibility to their altered circumstances, claimed to have received, or to be in expectation of receiving in the near future considerable sums of money, Schwartz from his father and Watt from his father-in-law. In one conversation Watt cautioned Schwartz not to talk so much, as that was the reason they were getting into trouble. At another time, as Schwartz was about to go to Philadelphia, a conversation between them was overheard in which Watt said,

"Harry, now I want you to be more careful with yourself when you go east, and see who you come in contact with." Schwartz replied: "My God, Newt., I thought you knew me better than that. Why, I would not tell even my own wife." Watt then said: "You want to be very careful;" to which Schwartz again replied: "Yes, I heard on the train the other day that the detectives were still after us; that Pinkerton had taken all his men off, but that the railroad company had hired new men." Watt again said: "Be very careful whom you run in contact with, as they might have a man in the east when you get to Philadelphia. You know, Harry, people are getting curious; you are spending so much money on $45 a month." Schwartz replied: "Oh! that's all right. I know how to take care of myself. They can't trump up no charge against me. Newt., I wish you were better fixed than you are." To this Watt replied: "That's all right. I can make that work through the old man." In another private conversation which was overheard by a witness, Schwartz remarked: "You seem to want to shove all the suspicion on me." Watt replied: "You are safe; your father is rich and you can easily account for the money." Schwartz then asked: "Why didn't you bring me two $50 bills in place of this $100 bill?" and Watt replied: "It was dark when I got it and I took the first one I came to." It is proved by Schwartz's admission that he at one time concealed $2000 in his house under the carpet. Watt being told that an officer had been searching Schwartz's house, inquired whether he had looked under the carpet.

Another conversation took place between Watt, Schwartz and witness Pinkerton in the county jail at Morris, in relation to a package of money containing $3000 in $50 and $100 bills which Schwartz claimed to have put into Watt's possession. In that conversation Schwartz said to Watt: "Why Newt., every time you came to the jail in Chicago I used to ask you if you had that parcel all safe, and you said, 'Yes, it is perfectly safe.' I asked you that repeatedly in the county

jail. Now tell me what became of it." Pinkerton then said: "I know what became of it. I know the very day you removed it from your house. You had that parcel in your possession until the afternoon of the 11th of December, and then you took it out of your house. Where you took it to I do not know." Schwartz then said to Watt: "There, Newt., now you see he knows a great deal. I never told him that. You see he knows a great deal more than we have given him credit for. He has told me things that I did not know that anybody knew." Watt replied, "Harry, I can't give you that parcel." Schwartz said: "Why can't you give it to him?" Watt replied: "I can't because I can't." Pinkerton then said to Watt: "You had it; what did you do with it?" Watt replied: "I hain't got it now, and I can't give it to you if you were to hang me for it. I hain't got it now." Pinkerton asked: "Where is it?" Watt answered: "I hain't got nothing to say about it." Pinkerton then said: "You had that parcel in your possession. If you have got rid of it in any way or burned it up or destroyed it, tell me about it." Watt replied: "I can not tell you any more than that. I hain't got it now and I can not give it to you if you were to kill me for it." Pinkerton then suggested: "Probably you people will come to a better understanding if you are left alone awhile." Schwartz replied: "Yes, let me see Watt alone." Pinkerton then left, and when he returned, Schwartz said: "I can not do anything more about it. Newt., tell him about it." Watt said: "What is the good of me telling him? He would not believe me, Harry, if I told him." Pinkerton remarked: "No, if you tell me that you stuffed $3000 of $50 and $100 bills into the fire, there is no need of your telling me that. I tell you candidly that I would not believe you." Watt replied: "Well, I hain't got it and can't get it, and there is no use of talking any more about it. I could not give it to you if you hung me for it. That ends it. I have nothing more to say." Pinkerton admits that Watt, in terms, denied that he had ever had in his possession the package of

money about which they were talking; and another witness who was present testifies that he made such denial repeatedly, and also that he several times admitted that he had had the package in his possession.

The foregoing are but a portion of the more important and significant circumstances appearing in evidence bearing upon the question of Watt's guilt of the crime charged. A considerable effort was made to impeach the veracity of some of the witnesses by whom the conversations above detailed were proved. On that subject we have only to say, that questions pertaining to the veracity of witnesses and the credibility of their testimony are ordinarily questions of fact for the jury. They see the witnesses themselves and hear them testify and have an opportunity to observe their appearance and demeanor on the stand, and are therefore best qualified to judge of the weight to be given to impeaching or corroborative evidence, and their decision of that question will not be disturbed by an appellate court except in rare and unusual circumstances.

It can not be doubted that the evidence in the case, when all the facts proved are duly considered, tends very strongly to prove the guilt of both the defendants. They had access to the cars in which both the murder and the robbery were committed, and therefore had the opportunity to commit those crimes. No other parties upon whom suspicion can possibly rest were seen by any witness in or about said cars, and it is difficult to conceive how, under the circumstances proved, any other parties could have gained access to the cars, committed the murder and robbery and escaped unnoticed. Watt was in the car in which the robbery was committed and the account he gives of the transaction abounds in so many improbabilities that the jury were justified in treating it as a mere fiction. Even if it were possible for one of two robbers to maintain his foothold on the roof of a car moving at the rate of forty or fifty miles an hour so as to co-operate at all with his confederate inside the car, it seems incredible that such

position should be deliberately selected, for the reason that such co-operation would manifestly be to the last degree uncertain and precarious. It is also difficult to see how the door of Watt's car could have been opened so as to admit of an intruder without at once attracting his attention. The greatly increased volume of noise from the engine and train which would have thus been admitted would have been instantly apparent. Nor was Watt's own conduct, as described by him, consistent with what might reasonably be expected of any ordinary man under like circumstances. It is certainly very extraordinary that the hand thrust through the transom and the man in the car should both disappear without his knowing when or how.

The murder was committed for purposes of plunder, and Schwartz's subsequent conduct, and especially the discoveries made during his return to Chicago the following night, render it extremely probable that he took charge of and carried away the money. These facts, coupled with proof of the subsequent unexplained possession by the defendants of large sums of money of the same denominations and description, and which may fairly be assumed to be portions of the stolen money, warranted the jury in finding them both guilty.

A certain portion of the testimony of witness Withrow was objected to by the counsel for the defendants and its admission is assigned for error. The witness testified to two conversations with Watt, in the first of which Watt detailed at length his version of the circumstances attending the robbery of the express safe. In the second conversation, as testified to by the witness, the former one was referred to, and the opinion expressed by him that he, Watt, had not disclosed all he knew about the transaction, but was keeping some part of it back through fear of injury or otherwise. The witness testifies that he thereupon urged him to make a clean breast of the whole matter as soon as he could; that Watt protested that he had told all he knew; that the witness then said to him: "Mr.

Watt, I have talked with a great many railroad men in regard to your version of this occurrence,—your riding in a car next to the tender, or with but one car between you and the tender, and a man coming in at the door of the car next to the engine, and you were sitting there with no one in the car but yourself, everything as quiet as could be, and in a tight railroad car. You say that some one opened the door and got to you and you heard no increased volume of sound in your car to attract your attention. There is nobody who believes that, and there must be some motive that you have for telling that." The foregoing statement being objected to and the objection overruled, the witness testifies that Watt answered: "Well I can't help it; it is true."

We can see no tenable ground of objection to this evidence. It consists of a statement made by the witness in the presence of and to the defendant, and to which he had an opportunity to and did reply. Declarations or statements made in the presence of a party are received in evidence, not as evidence in themselves, but to understand what reply the party to be affected should make to them. Even if he makes no reply, the statement is still admissible upon the principle that, if a party is silent when he ought to have denied, the presumption of acquiescence arises. *Gibney* v. *Marchay,* 34 N. Y. 302. The same rule applies in criminal cases. As said in Best on Presumptions, sec. 241, "A statement is made either to a man or within his hearing, that he is concerned in the commission of a given crime, to which he returns no reply; the natural inference is that the imputation is well founded or he would have repelled it. Silence is tantamount to confession." *State* v. *Cleaves,* 59 Maine, 298; *State* v. *Reed,* 62 id. 129; 2 Wharton on Evidence, sec. 1136.

The case of *Devine* v. *The People,* 100 Ill. 290, cited by the counsel for the defendant has no application. There it was held to be error to permit a police captain to testify that, on the night of the homicide, he saw another person and learned

from him what he knew about the prisoner and another, and that he and the police formed a theory that the prisoner and such other person committed the homicide.

Complaint is made of the admission of the evidence of two witnesses who were shown some hair found in Nichols' hands after his death and also a lock of hair cut from his head at the undertaker's, and who were permitted to testify that the two specimens of hair exactly resembled each other. The hair of both the defendants is dark and almost black, while that found in Nichols' hands was light brown in color, and there is therefore no pretense or claim by either party that said hair came from either of their heads. While we are of the opinion that the evidence was incompetent, it being no case for expert testimony, we are unable to see how any material prejudice can have resulted to the defendants from its admission. It was not offered as inculpatory evidence and could not have had that effect, as it had no tendency to prove that either of the defendants committed the homicide. Nor are we able to perceive how it could have had any material tendency to rebut any exculpatory theory which the defendants could legitimately base upon any evidence in the case. No other person is brought forward or identified as the supposed perpetrator of the homicide, and no theory is raised by the evidence as to any person other than Nichols himself to whom the hair found in his hands could have belonged. That there was a strong resemblance between it and Nichols' hair does not seem to be disputed, and whether the jury found its identity upon their own inspection or upon the testimony of the experts, does not, in view of the facts in this case, seem to be at all material.

The case is very different from that of *Knoll* v. *The State,* 55 Wis. 249, cited by counsel. There the prisoner was charged with murder, and the evidence tended to show that after the commission of the homicide he carried the body of the deceased on a wheelbarrow and concealed it in a swamp. Hairs were found on his wheelbarrow which resembled hair taken from

the head of the deceased, and an expert was permitted to testify that they both belonged to the same person. The admission of this testimony, in view of its important inculpatory bearing, was held to be an error sufficiently grave to necessitate a reversal of the judgment.

Exception was taken by the defendants to the following instruction given to the jury at the instance of the prosecution:

"The court further instructs the jury, as a matter of law, that the doubt under the influence of which the jury should frame a verdict of not guilty must always be a reasonable one. A doubt produced merely by undue sensibility in the mind of any juror in view of the consequences of his verdict, is not a reasonable doubt, and a juror is not allowed to create sources or materials of doubt by resorting to trivial and fanciful suppositions and remote conjectures as to possible states of facts differing from that established by the evidence. You are not at liberty to disbelieve as jurors if from the evidence you believe as men. Your oath imposes on you no obligation to doubt where no doubt would exist if no oath had been administered."

An instruction of which the foregoing is an exact copy was approved by this court in *Spies et al.* v. *The People*, 122 Ill. 1. We see no reason for departing from the doctrine laid down in that case, and are therefore disposed to hold that the propositions of law announced in said instruction are correct.

Several of the other instructions given by the court to the jury at the instance of the prosecution are subjected to more or less criticism by the counsel for the defense. Without protracting this opinion to the extent which would be necessary to a proper discussion of said criticisms in detail, we only deem it necessary to say, that we have given them careful consideration and are of the opinion that none of them are well taken.

A number of objections were raised at the trial to remarks of counsel employed to assist the State's attorney, in his closing address to the jury. Some of the remarks objected to are

perhaps justly subject to censure, but we are unable to say that, in view of the evidence and all the circumstances attending the trial, they constitute such grave departures from the proper line of argument open to counsel as to necessitate a reversal of the judgment. The only remark of counsel in respect to which we have been inclined to hesitate is the one in which allusion was made to the law permitting defendants to testify in their own behalf. While discussing the subject of convictions on circumstantial evidence, the counsel said: "My associates who preceded me spoke of circumstantial evidence. They told you and truthfully too, that mis-convictions and mis-trials on circumstantial evidence occurred almost entirely in the dark ages when prisoners were not allowed counsel in open court; when prisoners could not testify on their own behalf." Objection being interposed, the court stated in the hearing of the jury that the remark should not have been made. It appears, however, that one of the counsel for the defendants, in his argument, had already stated to the jury that defendant Schwartz had contradicted witness Withrow as to the circumstances under which his statements to said witness were made. This remark was made, as counsel assume, but as the record does not seem to show, in reference to certain testimony given by Schwartz at a time when the jury had been allowed to retire and during the investigation by the court in their absence of some question as to the admissibility of the testimony of said witness.

The statute which removes the disqualification of a defendant in a criminal case to testify in his own behalf provides that, "his neglect to testify shall not create any presumption against him, nor shall the court permit any reference or comment to be made to or upon such neglect." 1 Starr & Curtis' Stat. 486. It is no doubt the duty of the circuit court in all criminal trials, when the defendant does not testify in his own behalf, to see to it that the mandate of the statute is strictly enforced. Indirect and covert references to the neglect of the

defendant to go upon the witness stand may be as prejudicial to his rights as a direct comment upon such neglect. But it does not necessarily follow that every reference to the law on that subject is prohibited. The true test would seem to be, was the reference intended or calculated to direct the attention of the jury to the defendant's neglect to avail himself of his legal right to testify? In the present case we may fairly assume that such was not the intention of counsel. He was engaged in discussing in apparent good faith an entirely different proposition, and his incidental reference to the legal right of a defendant to testify in his own behalf was obviously made only by way of illustrating that topic. Nor are we able to see that the remark, in the connection in which it was made, was calculated to direct the attention of the jury to the defendants' neglect to testify. Such neglect was not spoken of, and the reference to their right to testify was in a discussion in which the attention of the jury was being directed to an entirely different topic. But if the allusion to the defendants' legal right to testify was otherwise improper, it is difficult to see how it could have prejudiced the defendants after the statement by their own counsel to the jury that one of them had in fact exercised that right.

We are of the opinion that the record contains no material error, and the judgment will therefore be affirmed.

*Judgment affirmed.*


Separate opinion by Mr. JUSTICE SCHOLFIELD :

I concur in affirming this judgment, but I dissent from that part of the opinion of Mr. JUSTICE BAILEY which assumes to give construction to section 9, article 2, of our present State constitution. I do not agree that the words, "jury of the county or district in which the offense is alleged to have been committed," as used in that article, were intended to, or that, when properly construed, they do, convey a different legal meaning, in the respect pertinent in this case, than that con-

veyed by the words, "jury of the county or district wherein the offense shall have been committed," as used in section 9, article 13, of the constitution of 1848.

It is assumed (and rightfully,) that "alleged" means as charged or stated in the indictment or information. It will be observed that while this clause describes the place or locality whence the jury are to come, it goes no farther. It makes no specific provision for cases where the crime is, in fact, committed in one county, but is, incorrectly, alleged to have been committed in a different county. It prescribes no rule of evidence, and it does not assume to authorize judgment to be rendered in favor of an allegation which is contrary to the fact proved upon the trial.

The constitution provides, (sec. 8, art. 2): "No person shall be held to answer for a criminal offense, unless on an indictment of a grand jury." But it nowhere undertakes to define what is meant by this language. That we learn by resorting to the common law. There we are informed that "the grand jury are sworn to inquire only for the body of the county, *pro corpora comitatus*, and therefore they can not regularly inquire of a fact done out of that county for which they are sworn, unless particularly enabled by act of Parliament." 4 Blackstone's Com. (Sharswood's ed.) 302, *303. There were on our statute book, when the present constitution was adopted, it is true, provisions, "that where an offense shall be committed on a county line, the trial may be in either county divided by such line," and that "where any offense shall be committed against the person of another, and the person committing the offense shall be in one county, and the person receiving the injury shall be in another county, the trial may be had in either of said counties." And, by necessary implication, it must follow that the grand jury of each of such counties has jurisdiction to indict for the offense. But these provisions are palpably framed upon the theory, that in such cases the offense is actually committed in both counties,—that there are

material criminal acts committed in each county, sufficient, of themselves, to constitute the offense; and they can therefore have no pertinency to the present question.

We are also informed by the common law, that the facts constituting the crime presented must be alleged, in the indictment, as having been committed where they were actually committed. 1 Chitty on Crim. Law, 195; 1 Wharton on Crim. Law, (7th ed.) 277; 1 Bishop on Crim. Proc. sec. 104. See, also, Gross' Stat. 1869, p. 199, sec. 1. And if the proof fails to sustain the allegation in this respect, the verdict must be for the defendant. 1 Bishop on Crim. Proc. 107; 1 Wharton on Crim. Law, (7th ed.) 601. "The county where the offense is alleged to have been committed," must therefore be the county where the offense is actually committed. There is no authority to allege any other county than that in which the offense was actually committed, and so, in legal contemplation, the words employed in the present constitution, and those employed in that of 1848, in this respect, intend the same thing.

Undoubtedly, under the provision of the present constitution a party indicted by a grand jury of that county for an offense as having been committed within a designated county, is entitled to be tried, under that indictment, by a petit jury of that county. But the county where the offense was committed being of the substance of the offense charged in the indictment, if the proof fails to show an offense committed within the county, as alleged, the offense charged in the indictment is not proved; and this clause of the constitution does not assume to confer authority upon the jury to then, notwithstanding this failure of proof, convict the defendant of an offense similar in kind to that charged in the indictment, but committed in a different county from that alleged; or, stated in different language, while this clause confers upon the defendant the right to be tried by a jury of the county where the offense is alleged to have been committed, it confers no authority upon that jury to convict him of an offense actually committed, and

sufficiently so proved upon the trial, in a county different from that alleged. Moreover, it appears, not only from the language, but likewise from the connection in which it occurs, that the purpose here was to protect the individual against oppression—against being taken for an offense committed in one county, and transported to a remote county, and there forced to be tried, thus imposing upon him heavy expenses to procure the attendance of witnesses, etc., and denying him the presence of friends. But under the construction adopted in Mr. Justice BAILEY's opinion, what guaranty has the citizen in Alexander county that he will not be indicted and transported to Jo Daviess county, and there forced to trial for an offense actually committed in Alexander county? If a grand jury of Jo Daviess county were ignorant or malicious, or corrupt enough to allege in an indictment that an offense proved to have been actually committed in Alexander county was committed in Jo Daviess county, the defendant would seem, under that opinion, to be without remedy. But, in that view, why was this provision adopted? A personal right for the protection of the individual against oppression can not rest in an arbitrary and irresponsible discretion of a grand jury. The one is utterly repugnant and irreconcilable with the other.

Assuming that I am right in the views just expressed, I am nevertheless of opinion that section 402, of division 10, of the Criminal Code, (Rev. Stat. 1874, p. 407,) may still be sustained as a constitutional and valid enactment. The right guaranteed to the defendant is that of trial by an impartial jury of the county. Whether the burthen of showing that he has not been deprived of that right shall rest upon the People, wholly or only in part, or whether the burthen shall rest upon him to show that he has been deprived of that right, are questions with which the constitution does not deal. Having guaranteed the right, it leaves all questions of detail as to the mode of ascertaining when it shall have been violated, to the legislature, and manifestly, therefore, the question of where the burthen

of proof, in this respect, shall in the first instance rest, is purely one of legislative policy. See Cooley's Const. Lim. (1st ed.) 288. Under this section, if it can "readily be determined in what county the offense was committed," the offense must be charged to have been committed and the offender be tried in that county, for this is the plain and obvious meaning of the language employed; but "if it can not readily be determined in what county the offense was committed, the offense may be charged to have been committed and the offender tried in any of the counties through or along or into which such railroad car or water-craft may pass or come, or can reasonably be determined to have been on or near, the day when the offense was committed." Since, therefore, it is competent for the General Assembly to say, in the first instance, every offense shall be presumed to have been committed in the county alleged in the indictment, unless the defendant shall prove otherwise, it is unquestionably competent for it to say, as is, in effect, here said, that proof showing "that it can not readily be determined in which county the offense was committed," shall be sufficient evidence that it was committed in the county alleged. The burden is here, by the well settled rules of pleading and evidence, upon the State, in default of specific proof of the venue of the alleged offense, to prove "that it can not readily be determined in what county the offense was committed," and "that which the People are required to prove, the defendant is at liberty to disprove." And so, if he is, by the trial, being denied his constitutional right of trial by a jury of the vicinage, he can establish that fact by proving the actual venue of the offense, and thus enable the State to proceed against him anew in the proper county, where he will have that right. This right is a purely personal right, which the defendant is at liberty to waive if he shall choose to do so, and so long as, by change of statute, he is not denied the opportunity to assert it, he has no right to complain.

The evidence here clearly makes the *prima facie* case, upon behalf of the People, contemplated by the statute. The defendant had the opportunity to disprove that case, but failed to do so. It is therefore to be assumed the offense was actually committed in the county alleged, and where the defendant was indicted and tried and convicted.