[No. 1305.]

THE STATE OF NEVADA, Respondent, v. JOSIAH POTTS
AND ELIZABETH POTTS, Appellants.

Criminal Law — Evidence — Bill of Exceptions. — Objections to the
admission in evidence of certain bills of sale will not be considered
on appeal because the bills of sale are not embodied in the bill of
exceptions.

Idem—Circumstantial Evidence—Instructions—Reasonable Doubt.—
The court after giving the statutory definition of "reasonable doubt"
(Stat. 1889, 27,) and instructing the jury as to the law relating
to circumstantial evidence, instructed the jury "that the doubt
which the juror is allowed to retain on his own mind, and under
the influence of which he should frame a verdict of not guilty,
must be a reasonable one. A doubt produced by undue sensibility
in the mind of any juror, in view of the consequences of his ver-
dict, is not a reasonable doubt, and a juror is not allowed to create
sources or materials of doubt by resorting to trivial or fanciful suppositions
and remote conjectures as to possible state of facts differing from
that established by the evidence. You are not at liberty to dis-
believe, as jurors, if from the evidence you believe as men. Your
oath imposes on you no obligation to doubt where no doubt would exist
if no oath had been administered." *Held*, that this instruction related
merely to the rules by which the jury ought to be governed in
their consideration of the evidence in the case, and was not prejudicial to
defendants.

IDEM — REASONABLE DOUBT — STATUTE DEFINITION SHOULD ALONE BE GIVEN. — *Held*, that the statutory definition of "reasonable doubt" (Stat. 1889, 27,) is well expressed, and that judges should follow the exact language of the statute, and not attempt any further explanation.

IDEM—DUTY OF JURORS—INSTRUCTION MISLEADING.—Defendants asked the court to instruct the jury " that each individual juror should decide for himself what his verdict should be. No juror should yield his deliberate, conscientious conviction either at the instance of a fellow-juror, or at the instance of a majority. Above all, no juror should yield his honest conviction for the sake of harmony or unanimity, or to avert the disaster of a mistrial. Jurors have nothing to do with the result of a disagreement or the consequences of a mistrial. This does not mean that you may not discuss the evidence one with another, or that you may not together go over the testimony and compare opinions; but that each one of you must, upon his oath, form his own judgment, and not accept the judgment of another unless the testimony in the case causes him to arrive at the same conclusion. You are to form your separate opinions from the testimony and not from what some other one of you may think to be right." (No. 7, referred to in opinion.) *Held*, that the court did not err in refusing this instruction; that, as worded, it was calculated to mislead the jury.

APPEAL from the District Court of the State of Nevada, Elko County.

*R. R. Bigelow*, District Judge.

The facts are stated in the opinion.

*J. A. Plummer*, for Appellants.

I. The court erred in allowing the prosecution to introduce the bills of sale. These documents were admitted to show that Mrs. Potts possessed the ability to counterfeit the signature of Faucett, and neither had any relevancy or pertinency to the issues in the case. The testimony must be confined to the allegations and the point in issue. A person on trial for one crime cannot be presumed to be guilty because he has at another time committed a different crime, nor is the latter admissible in evidence against him. (*People* v. *Jones*, 31 Cal. 570; *People* v. *Tyler*, 36 Cal. 526; *People* v. *Bowen*, 49 Cal. 654; *People* v. *Barnes*, 48 Cal. 551; *Barton* v. *State*, 18 Ohio, 221; *Farrer* v. *State* 2 Ohio St. 72; *Coble* v. *State*, 31 Ohio St. 100; *Cesure* v. *State*, 1 Tex. App. 19; *Commonwealth* v. *Wilson*, 2 Cush. 590; *Coleman* v. *People*, 55 N.Y.81; *People* v. *Corbin*, 56 N.Y.363; 15 Am.Rep.427.

Nor can the error be avoided on the ground that it might possibly not have influenced the jury in its deliberations. The reception of incompetent and immaterial evidence which may work prejudice is a fatal error. (*Baird* v. *Gillett,* 47 N. Y. 186; *Worrall* v. *Parmlee,* 1 N. Y. 519; 49 Am. Dec. 350; *Starin* v. *People,* 45 N. Y. 341; *Ross* v. *Ackerman,* 46 N. Y. 210.) Recognizing the evil and specious character of this testimony, the English courts, the Supreme Court of the United States, and a large number of the courts of last resort in the different states have held that: " A document or writing cannot be put in evidence simply for the purpose of comparison of handwriting," even where that comparison is sought to be made with the *contested signature.* (Ros. Cr. Ev. 209; *Randolph* v. *Loughlin,* 48 N. Y. 460; 1 Greenl. Ev., Sec. 580; *People* v. *Spooner,* 1 Den. 343; 43 Am. Dec. 672; *Strother* v. *Lucas,* 6 Pet. 763; *Van Wyck* v. *McIntosh,* 14 N. Y. 442; *Clark* v. *Wyatt,* 15 Ind. 271; 77 Am. Dec. 90; *Woodard* v. *Spiller,* 1 Dana, 180; 25 Am. Dec. 139; 1 Phill. Ev. 490; *Moore* v. *United States,* 91 U. S. 270; *Hynes* v. *McDermott,* 82 N. Y. 50; 37 Am. Rep. 538.)

II. The court erred in giving to the jury the instruction on the subject of reasonable doubt.

III. The court erred in refusing to give the jury the seventh instruction asked for by the defense. (*Castle* v. *State,* 75 Ind. 146.)

*J. F. Alexander,* Attorney General, for Respondent.

By the Court, MURPHY, J.:

The indictment charges the defendants with the crime of murder. They were jointly indicted, tried, and found guilty of murder in the first degree. Miles Faucett resided on a ranch seven miles from Carlin, in Elko county. He appears to have been on terms of friendship with the appellants, having boarded at their house in Carlin before he moved to the ranch, and the defendant Elizabeth Potts was doing his baking and washing. On the evening of the first of January, 1888, he was seen at the house of the defendants by J. R. Linebarger, who asked Faucett if he was going back to the ranch that night; and, after Faucett answered in the affirmative, tried to dissuade him from going, and invited him to come and stop with him (Linebarger) for the night. The defendant Elizabeth Potts invited Faucett to remain at their house over night. Faucett and Linebarger then

left Potts' house, took Faucett's team, and hauled some hay for Linebarger.  Afterwards drove to Linebarger's house.  Put some bran in the sleigh to feed the horses with.  Then Faucett said he would go and stop at Potts' house over night, as they owed him some money, and he thought it doubtful whether he could get it or not, and he was going there to try and get it, as the Pottses were going away.  Before leaving Linebarger, Faucett paid him a debt he owed him of five dollars.  For the purpose of paying this sum, Faucett drew a purse from his pocket, which purse contained about one hundred dollars.  When Faucett left Linebarger to go to Potts' house it was between five and six o'clock in the evening, and was the last time that Faucett was seen alive by any person outside the family of the defendants.  Potts afterward told Linebarger and a number of other persons that Faucett had gone east on train number one, which left Carlin between six and seven o'clock on the evening of the first of January, 1888, giving as a reason for Faucett's sudden departure, that they had some difficulty.  On the third or fourth of January, 1888, the deputy sheriff drove out to Faucett's ranch, found the door of the house open, and everything of value taken away.  Linebarger had loaned Faucett a pick and shovel to use on his ranch.  They were afterwards found at Potts's house.  Potts also had Faucett's team, wagon, sleigh and other property that was known to belong to Faucett.  The Potts family left Carlin in the month of September, 1888.  In the month of December, 1888, the remains of a human being were found buried in the cellar connected with the house occupied by the defendants while living in Carlin.  A part of the head was gone, the legs below the knees had been cut off, and one arm was gone.  There was neither money or papers found with the remains.  The defendants were arrested in Wyoming Territory.

On the preliminary examination both defendants admitted that the remains found in the cellar were the remains of Miles Faucett.  Elizabeth Potts testified that she caught Faucett, in the summer of 1887, in a barn close by her house, where he had been sleeping in the day-time, in the act of ravishing her four-year old daughter.  She also testified that Faucett boarded with them for some time after this happened, and until Faucett had left Carlin to live on the ranch; that she baked, washed, and ironed for him up to the time of his death; that he came to

her house twice a week for his bread and clothes; that he owed them one hundred and eighty dollars for board, washing, and baking. In all other matters, in relation to the manner in which Faucett came to his death, she corroborated her husband. Charles Potts, son of the defendants, also corroborates their statements as to the manner of the shooting, and Faucett taking his own life.

Defendant Josiah Potts testified that during the evening they all took several drinks of liquor. Their son Charley played on a guitar and sang a song, after which he (Potts) went to his wife's trunk, as he says, to get some stamps, because he was going to write for a catalogue, and there found a letter written by his wife to one McIntosh, in which it is purported to have been written that Faucett had some time prior thereto attempted improper liberties with the daughter of the defendants, and that Faucett had also made threats as against the lives of the defendants, and he would take his own life afterwards. Potts then says: " I took the letter in the other room. Faucett was sitting near the window. I asked Faucett what he meant by this. I took and read the letter to him. He said, 'Well, Joe, I must have been crazy.' 'Well,' I said, 'crazy or no crazy, I will have you lynched for it.' He dropped on his knees, you know, and begged me to let him go, and said he would make over his property to pay our debt—what he owed us. He said he would make over the horses and wagon and the ranch at Hot Springs. He said he did not think that would more than pay what he owed us. Wife said: 'Let him go;' so I stood a little while. At that he wanted to get paper and pencil. He asked my wife for paper and pencil. There happened to be a little memorandum book on the table at the time, so he picked that up, and said, 'that will do.' He tore a leaf out, and wrote it out. At last he asked my wife to write it; that he did not feel able, or something to that effect. She wrote it out. He stepped up to the corner of the table, and signed it. There was something else that he wanted to put to it, about his going away. I was busy reading the letter. That bill of sale was handed to me. Then I—in the mean time, I was looking at the letter—I got so aggravated that I could not make up my mind to let him go. I threw it back and said: 'To hell with your note!' I said: 'I will have you lynched anyway.' He jumped up and grabbed

the revolver, and said: 'No, you don't; you will be blamed for this'; and shot himself.   He took the revolver from the cupboard.   We always kept the pistol there, out of the way of the children.   He said he was only playing with the girl; he must have been crazy.   After that I sent wife and Charley out and shut the door.   After that I went back into the room, and sit there most half the night, thinking what I should do.   I came to the conclusion to bury him, because I was so overcome with fright.   I thought I should be blamed for it.   I took him down in the cellar.   I carried him out.   I did not search the body."

On cross-examination defendant said: "After his death I did not take any papers from his person.   I took no money from his person.   I took no papers from his ranch.   I took some old bed-clothes from his ranch.   We had used what we had to cover him up.   I did not know that Faucett had about his person or his ranch any notes or accounts.   I do not know what became of his money nor papers that he had, if any. After he had shot himself, I picked up the dead body, and put it on the bed.   I then picked the body up off the bed, and carried it out of the house into the cellar, and buried him in the side of the cellar."   The body was left buried about three months, when the defendant uncovered it, and with an axe cut off the head, arms, and limbs, and, after a fruitless attempt to burn the remains, again buried the body.   The witness then went on to say: "Faucett shot himself with my pistol.   He shot himself in the back part of the head, back of the ear.   I do not know whether it broke in the skull or not.   The bullet did not go through Faucett's head.   It lodged in his right eye. After Faucett shot himself, I picked up the bill of sale, and put it in the cupboard.   I put the letter in my pocket and afterwards gave it to Capt. Palmer.   I went out to the ranch, and brought back the tool-box with me.   I took what writing there was in the tool-box.   There were a lot of papers in there.   I did not notice what they were.   I burned them up; burned them to get rid of them.   I did not look to see what they were. I went to the ranch about seven o'clock.   Cannot give any reason for waiting until after dark before I went out to the ranch.   I did not bury the body until the next night after the shooting, and after I had been to the ranch.   My wife did not help me bury the body, nor to cut the head and feet off.   She

did not assist me in doing anything with the body. I told my wife that I had taken the body off and buried it."

The appellants present several grounds of error, which they claim were committed by the court below.

1. On the trial of the case it is claimed that the prosecution offered in evidence two bills of sale, marked "Plaintiff's Exhibits A" and "B," and that the said exhibits were admitted in evidence, notwithstanding they were objected to by the defendants. After a careful examination of the transcript, we fail to find any exhibits. At page 101 of the transcript we find where the prosecution offers "Exhibits A" and "B," but the contents of the papers are not set forth, and the question as to their admissibility cannot be considered by this court, because they are not embodied in the bill of exceptions, and we cannot go outside the record, and take from appellant's brief, statements of what they say are copies of papers that were introduced as evidence on the trial of the cause below. (*State* v. *Baker*, 8 Nev. 145; *State* v. *Larkin*, 11 Nev. 320; *State* v. *Mills*, 12 Nev. 405.)

The record, however, contains enough testimony to show that the exhibits were offered in evidence for the purpose of showing, by identification and comparison of the signatures, that the signature of "Miles Faucett" to the bill of sale conveying his property and effects to the defendant Josiah Potts, was in the handwriting of Mrs. Potts. It was clearly admissible for the prosecution to prove, if it could, that Mrs. Potts had written the name of Miles Faucett to this bill of sale, as it would tend to show motive for the homicide. It is true that the bill of sale from Faucett to Potts had been lost, and that it was not exhibited at the trial. The comparison of signatures at the trial was made between exhibits A and B, one of which was claimed to be in the handwriting of Faucett, and the other in the handwriting of Mrs. Potts, showing a similarity in the signatures. There was no testimony tending to show that a comparison had been made between the signatures on the exhibits with the signature on the bill of sale that was lost. It must be admitted that the character of this testimony was in many respects unsatisfactory, and it could have been argued with much force by appellants' counsel at the trial that it was insufficient to establish the fact, beyond a reasonable doubt, that Mrs. Potts had signed Faucett's name to the lost bill of sale. The conviction of appellants is not, however, dependent upon the

weight to be given to this testimony. The evidence, independent of this testimony, is clear and convincing as to the guilt of both defendants. Viewed in any light, it is apparent that the admission of the exhibits A and B, and proof of the similarity of the signatures of Faucett, could not have prejudiced the defendants. It does not affirmatively appear, as claimed by appellants' counsel, that the exhibits, and the testimony with reference to the signatures thereto, were admitted for the purpose of proving a separate and distinct offense from that charged in the indictment. If the testimony established the fact that she had committed a forgery, that fact was only incidental to the fact in issue. The fact that such evidence also tends to prove another and distinct crime from that of murder does not destroy its admissibility for the legitimate purpose of proving a motive for the crime of murder. It might, with just as much plausibility and reason, be claimed that the testimony given by Linebarger, to the effect that Faucett had, just previous to going to Potts' house, about one hundred dollars, was inadmissible, because, when considered with the other fact, that no money was found upon the body of the deceased, it tended to show a distinct offense, to wit: the crime of robbery.

2. The second assignment is that the court erred in giving the following instruction to the jury at the request of the prosecution: "The court instructs the jury, as a matter of law, that the doubt which the juror is allowed to retain on his own mind, and under the influence of which he should frame a verdict of not guilty, must be a reasonable one. A doubt produced by undue sensibility in the mind of any juror, in view of the consequences of his verdict, is not a reasonable doubt, and a juror is not allowed to create sources or materials of doubt by resorting to trivial or fanciful suppositions and remote conjectures as to possible state of facts, differing from that established by the evidence. You are not at liberty to disbelieve as jurors, if from the evidence you believe as men. Your oath imposes on you no obligation to doubt, where no doubt would exist if no oath had been administered." The objection to the instruction is that it is another and different definition of "reasonable doubt" from that required by the statute of 1889, 27. The statutory definition is as follows: "A reasonable doubt is one based on reason. It is not mere possible doubt, but is such a doubt as would govern or control a person in the more

weighty affairs of life.   If the minds of the jurors, after the
entire comparison and consideration of all the evidence, are in
such a condition they can say they feel an abiding conviction
of the truth of the charge, there is not a reasonable doubt. .
Doubt, to be reasonable, must be actual and substantial; not
mere possibility or speculation." The prosecution in this case
relied on circumstantial evidence for a conviction, and under
that theory the case was tried and the instruction complained of
given.

The earliest record we have where the substance of the instruc-
tion was given is in the case of *Commonw.* v. *Harman*, 4 Pa.
St. 273, in which case the prosecution relied upon circum-
stantial evidence.   Chief Justice Gibson, in charging the jury,
used the following language:   "All evidence is more or less
circumstantial, the difference being only in degree; and it is
sufficient for the purpose when it excludes disbelief that is
actual, and not technical disbelief; for he who is to pass on the
question is not at liberty to disbelieve as a juror, while he
believes as a man.   It is enough that his conscience is clear."
This instruction was not intended by the learned chief justice
as a definition of "reasonable doubt"—for in his closing
remarks to the jury he defines a "reasonable doubt"—but had
reference to the evidence in the case, and admonished the jury
that they ought not to disbelieve as jurors, if they would
believe as reasonable men.   In the case of *Fife* v. *Commonw.*, 29
Pa. St. 438, Lewis, C. J., commenting upon an instruction copied
from the above, said:   "It must be remembered that jurors
are men, and that it is because they have human hearts and
sympathies and judgments that they are selected to deter-
mine upon the rights of their fellow-men.   If they were
more or less than men they would not be the constitutional
peers of the prisoner, and would be disqualified to decide his
cause.   The term 'jurors' means nothing more than twelve
men qualified and sworn to try a cause according to the
evidence.   Their oaths as jurors rest on their consciences
as men, and as men they are accountable to God and
their country for their verdict.   Nothing more is demand-
ed of them as jurors than an honest exercise of their
judgment as men.   The evidence which produces conviction
on their minds in one capacity works the same result in another.
Their belief is the same in both."   In that case the instruction

was not taken as a definition of "reasonable doubt." In the case of *Nevling* v. *Commonw.*, 98 Pa. St. 334, the court, after defining "reasonable doubt," used the following words: "You cannot doubt as jurymen while you believe as men." Justice Green, after passing upon the definition of "reasonable doubt," as explained by the court, and holding the same to be correct, then said: "The learned judge then proceeded to say that the doubt must be a reasonable one, and that jurymen could not doubt as jurymen what they believe as men. In all this there was no error. It is the familiar language found in the text-books and decisions which treat of the subject. The whole language of the judge must be taken together, and we fail entirely to perceive any tendency to mislead the jury, or to lower the grade of proof required to convict." In the case of *McMeen* v. *Commonw.*, 114 Pa. St. 305, the following language was used in an instruction: "You should be convinced as jurors when you would be convinced as citizens, and you should doubt as jurors only where you would doubt as men." Justice Paxson, after reviewing the decision above referred to, said: "The language used was in connection with the evidence," and in this connection was proper. "Undoubtedly, a juror should be convinced from the evidence where he would be convinced as a man, and when the language is applied in this way we see no technical error." The instruction given in this case, without a doubt, was copied from instruction number thirteen asked for and given on the part of the prosecution in the case of *Spies* v. *People*, 122 Ill. 82; 3 Am. St. Rep. 320. At page 252, the court, after referring to the Pennsylvania cases above mentioned, said· "By the twelfth and thirteenth instructions, considered in connection with the eleventh instruction for the state, and also in connection with the definitions of 'reasonable doubt' as embodied in the instructions given for the defense, we think the law upon this subject was correctly presented to the jury." The eleventh instruction in that case was as to the rule of law which clothes every person accused of crime with the presumption of innocence, and imposes upon the state the burden of establishing his guilt beyond a reasonable doubt. The twelfth instruction is a clear definition of "reasonable doubt." The thirteenth, the one complained of, applied to the evidence in the case. The same instruction was given in the case of *Watt* v. *People*, 126 Ill. 9, and approved by the supreme court of Illinois.

The court instructed the jury fully as to the law of the case, and gave the statutory definition of "reasonable doubt;" and the giving of the instruction complained of does not give the appellants any just ground of exception. The instruction relates merely to the rules · by which the jury ought to be governed in their consideration of the evidence in the case. The jurors were directed by it to bring to the consideration of the evidence before them their every-day common sense and judgment as reasonable men, and those just and reasonable inferences and deductions which they, as men, would ordinarily draw from facts and circumstances proven in the case, they should act on as jurors. They were not to fancy situations or circumstances which they could not draw from the evidence, but they were to make those just and reasonable inferences from the circumstances proven which the guarded judgment of reasonable men would ordinarily make under like circmstances.

The term "reasonable doubt" is well understood by every man of common sense. It would be difficult to select words that would define their meaning better than is set forth in the statute, and we would recommend to the judges that they follow the exact language of the statute, and not attempt any further explanation. We often find in the expression of courts language that ought not to have been used, but when carefully considered in connection with all other instructions in the case, convinces the mind that it could not have misled the jury. This is true of the instruction under review. Standing alone, the law would not have been complied with. When we read it in connection with the statutory definition of "reasonable doubt," and the other instructions given in the case, we are satisfied that no prejudicial error has been committed. Jurors are often reluctant to find a verdict of conviction on circumstantial evidence, however convincing the circumstances proven may be, and the weight of such testimony is often disparaged by counsel for defendants. It is proper, in cases in which circumstantial evidence is relied upon, for the court to admonish the jury as to their duty in dealing with it, and a necessity often exists for the court to so instruct, in order to secure a just and faithful administration of the law. Jurors should be admonished that circumstantial evidence should be fairly and reasonably considered; that such inferences should be drawn from the

facts and circumstances proven as would be drawn from them by just and reasonable men.

The court did not err in refusing to give instruction number seven, asked by defendants. As worded, it was calculated to mislead the jury. Jurors should · carefully examine and give due weight to all the evidence in the case, with an honest and conscientious effort to reconcile any 'difference of opinion that they may entertain as to the truth of the charge; and in cases like the present one, where the exact truth can never be disclosed, and where there is . a difference of opinions among jurors, they should dispassionately discuss the points upon which they differ, with a view to agree if they can conscientiously do so. But no juror is required to surrender his convictions unless he is convinced of the truth of the charge. But, as was said in the Iowa case: "A jury need not be advised of so simple a proposition. The usual method of instructing upon the measure of proof required in criminal cases is sufficient." (*State* v. *Hamilton*, 57 Iowa, 598; *State* v. *Rorrbacher*, 19 Iowa, 160.)

In the case of *State* v. *Smith*, 49 Conn. 386, where a similar instruction was refused, the court said: "We think this is not sound law, and that the court would not have been justified in complying with the request. Although the verdict to which each juror agrees must, of course, be his own conclusion, and not a mere acquiescence in the conclusions of his fellows, yet, in order to bring twelve minds to a unanimous result, the jurors should examine with candor the questions submitted to them, and with due regard and deference to the opinions of each other. In conferring together, the jury ought to pay proper respect to each other's opinions and listen with candor to each other's arguments. If much the larger number of the panel are for a conviction, a dissenting juror should consider whether the doubt in his own mind is a reasonable one, which makes no impression upon the minds of so many men equally honest, equally intelligent with himself, who have heard the same evidence, with the same attention, and with equal desire to arrive at the truth, and under· the sanction of the same oath; and, on the other hand, if a majority are for acquittal, the minority ought seriously to ask themselves whether they may not reasonably, and ought not to, doubt the conclusion of a judgment which is not concurred in by most

of those with whom they are associated, and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellows." (See also, *Commonwealth* v. *Tuey*, 8 Cush. 2.)

We have examined the charge of the court with care, and it fully and fairly presents the law of the case. We have also examined the whole record, and we do not find that it contains any error prejudicial to the defendants. The judgment of the district court is therefore affirmed, and the court below directed to fix a day for carrying the sentence into execution.