## CAROLINE LOUISE CARTER

### v.

## LESLIE CARTER.

*Divorce—Cruelty—Evidence—*Res Gestæ*—Instructions.*

1. A harmless error will not justify a reversal.

2. Whether testimony is competent does not depend upon its credibility, but in determining whether a technical error, if one were committed, by its rejection should be a cause for reversal of the judgment.

3. Whenever an inference is to be drawn by a jury for or against a party, the facts and circumstances from which it is to be drawn are material and traversible.

4. The objection that a deposition in a given cause does not contain the best evidence of the matters referred to, goes to the substance and not the manner of the proof, and before such objection can be considered, it is essential, before trial, to move to suppress the same.

5. A witness should not be allowed to state his conclusions, arising from conversation and noises in an adjoining room to one occupied by him, as to what occurred therein. Such question must be decided by the jury upon consideration of the facts as testified to by the witness.

6. Where, before entering upon trial, notice of the taking of depositions is served upon one of the parties thereto, he may elect whether he will examine the witnesses orally, under Sec. 28, Chapter "Evidence," R. S., and he can not be required to leave the trial in order to exercise this right.

7. Upon a bill filed by a wife for a divorce upon the ground of cruelty, by a divided court this court holds that the trial court properly excluded the testimony of complainant upon re-direct examination touching her belief as to the source from which came certain large sums of money received by her, and why; likewise as to her declarations upon certain occasions immediately after leaving, in the night time, the room occupied by herself and husband; that evidence as to what happened upon a certain occasion, when the defendant found letters incriminating the complainant, was admissible, being *res gestæ;* likewise evidence as to the life led and the sums of money spent by her while abroad; likewise evidence as to excursions with men other than her husband in this country; that certain instructions asked in her behalf were properly refused; and declines, in view of the evidence, to interfere with the decree in behalf of the defendant.

[Opinion filed July 9, 1890.]

APPEAL from the Superior Court of Cook County; the Hon. EGLERT JAMIESON, Judge, presiding.

Messrs. SIDNEY SMITH, W. J. HYNES and R. W. MORRISON, for appellant.

Messrs. EDWIN WALKER, LUTHER LAFLIN MILLS and F. J. LOESCH, for appellee.

GARY, P. J.    While Judge Garnett was still a member of this court we studied the evidence shown in the voluminous record of this case, with all the care that the utmost hopes or fears of the parties themselves could exact.

That evidence need not be recited or summarized; it is enough to say that it is such that the verdict of the jury, upon the issues joined between the parties, is final and conclusive, if there be no fatal error in the proceedings through which that verdict was reached.   With, therefore, no further reference to the evidence than may be necessary in discussing the other questions in the case, the assignment of error, upon the denial of the motion for a new trial, is overruled.

The other questions can be discussed most perspicuously by taking up the case here in the order of its presentation in the Superior Court, and reviewing them with the aspect they then bore.

The appellant filed in that court on the 5th day of November, 1887, her original bill for a divorce from the appellee, and on the 12th day of March, 1888, an amended bill, which took the place of the original.   This amended bill charges cruelty, with specifications of the particular instances, as the ground for relief.   It alleges that finally her health was broken down; that by the advice of eminent physicians, she, in October, 1885, went to Europe for the second time during that year, having first gone in August.   And that the defendant, " though a man of large means, failed and refused to furnish any portion of the moneys necessary for the support of complainant during her said trip in Europe; but complainant was obliged to sell her wardrobe to defray part of her expenses, and to rely upon means derived from her mother and a lady friend for her support while so in Europe."

This allegation the answer of the appellee denied, not only by the general traverse, but substantially in the terms in

Carter v. Carter.

which it was made. The answer also denied all charges of cruelty, and by a replication all the matters charged in the bill and not admitted by the answer were put in issue. She was her own first witness. On her direct examination the only testimony which bears any relation to the matter of the allegation quoted, is, that in a conversation between the parties the day before she sailed on her first trip, in which she told him she was going the next day, she says: " I told him I intended to support myself in whatever way I could. get employment if I could. He did not offer me any money then, and he did not ask me any questions as to what money I had."

Condensing from her testimony on her cross-examination, she says that when she went in August, her mother gave her a part of the money she had then, and part of it she had saved from time to time, and then, with a good deal of uncertainty as to the period to which the testimony relates—for it appears she came back in September, 1886, went again, and finally returned in November, 1886—she says she received no money from her husband, that she can remember of, while absent in Europe; none from any gentleman other than her husband; that she had money, but don't think she can tell within $25,000 how much; don't know that such an amount of money as over $60,000 was remitted to her from New York between October, 1885, and November, 1886, to her credit; had money, and it must have been sent to her from New York; always had a letter of credit. In reply to this cross-examination, the counsel of the appellant sought to prove, by her, on re-direct examination, that a Mrs. Constable, who seems from other parts of the record, to be a resident of New York City, " was a wealthy lady in her own right; that she was childless herself; that Mrs. Carter related to Mrs. Constable to a great extent the nature of her troubles; that she became interested in Mrs. Carter, and assured Mrs. Carter that she would assist her financially on her trip; that, as Mrs. Carter understood, that assistance was to be sent to the banks, and when it came from the banks, it was to be a full verification of what she understood Mrs. Constable was to do, and received it with that understanding."

This not being permitted by the court is the subject of the first exception taken on the trial, and is now for consideration.

The offer, as then made, as has been seen, was not that the fact as to where the money came from could be proved by what took place between the two ladies before it came, but the belief of Mrs. Carter as to where the money came from, and why she so believed, was the matter to be proved by the circumstances detailed. The argument to the Superior Court was, "counsel (for the appellee) wants to draw the inference, because she received money not from her mother, that it was from somebody for improper purposes. Now, we propose to show that she related her troubles to Mrs. Constable; that Mrs. Constable told her that she would aid her, and that as she was at the time receiving, she understood it came from Mrs. Constable." There was no issue in the case as to her belief where the money came from, but the testimony being specifically offered for the one purpose of proving her belief and the ground for it, if it was not admissible for that purpose, the rejection of it was not error. Byler v. Asher, 47 Ill. 101; State v. Neville, 6 Jones' Law, N. C. 425; Beard v. Dedolph, 29 Wis. 136; In re Story, 20 Ill. App. 185.

This last case was reversed in the Supreme Court (120 Ill. 244), but this point left untouched. And see a general discussion on the subject, Sec. 675 *et seq.*, 1 Thomp. on Trials.

True, the appellee in his answer had charged adultery, but if this testimony could have any relevancy to that charge, the appellant certainly did not intend to then enter upon her reply to that charge, and thus, under the rules of practice (1 Greenleaf Ev., Sec. 74), perhaps be compelled to exhaust her evidence on that subject, before any evidence was put in against her. Nor was the offered testimony in reply to, or explanation of, any circumstances elicited by the cross-examination. The amount of money she had in Europe was a fact independent of the source it came from. And as touching her credibility as a witness, testifying to alleged acts of cruelty—the only matter in issue at this stage of the trial—can it be believed that she would have strengthened that, by stating her belief that a rich and childless woman, moved by sympathy and pity,

had supplied her with money to an amount exceeding the salary of the president of the United States in the same period? The admission of this testimony would have involved this inconsistency : that under color of proving a fact not within the issue, hearsay and incompetent, as will be hereafter shown, evidence of a fact in issue might be given, even when counsel offering it did not claim that it was admissible as evidence of such fact. In another connection it will be necessary to determine whether testimony of this character can be received as evidence of the fact of the source of the money.

The next thing that claims attention in the order of the events on the trial, is the refusal of the Superior Court to permit witnesses—the mother and the maid of the appellant—to testify to declarations of the appellant on several occasions, when she came of nights, and in nightdress, crying, to their rooms. That she did so come, was testified to without objection. It is not, therefore, a question whether evidence of that coming was admissible. " Whenever a fact is admissible in evidence, a declaration accompanying that fact is competent," says the brief on behalf of appellant. Waiving any inquiry whether, in this case, the alleged facts were admissible, the only possible significance of the offered declarations would have been to show why she left her husband's room.

In the language of the Supreme Court, that was a " completed past affair," and her declaration, as a history of it, incompetent as evidence. Chi. W. D. Ry. Co. v. Becker, 128 Ill. 545. It was not a declaration accompanying the fact of her departure from the room, where it is assumed her husband was, but following such departure. This closes the review of the case up to the time that the appellant rested, on the introduction of her evidence in chief, in support of her bill. The questions yet to be considered require that the case shall, from this on, be considered as a whole.

On the 30th day of January, 1888, the appellee filed his cross-bill, charging adultery, specifying times, persons and places, and by appropriate pleadings the charges were put in issue.

The appellee was the first witness in his own behalf. The appellant had testified that in the fall of 1884, at the Fifth Avenue Hotel, in New York, they had an " unpleasantness," of which she states a cause—that she threw a big pitcher of water on him, which went all over him and the bed on the side of which he was sitting, and that he then struck her in the face. He admitted the water throwing, denied the striking, and gave as the cause of that trouble, that in the afternoon of the day previous, wanting an envelope, he had gone to her portfolio for it; found three letters, which he produced, and that the trouble was about them. The letters were admitted in evidence over the objection and exception of appellant. There is no objection now made to the sufficiency of the proof that they were written by one Charles C. Deming, of New York. The appellee says he read one and part of another of them to her, she objecting, and then gave them to her, and she tore them up and threw them into a jar, from which he afterward took them and pieced them together.

It is admitted that it was right for the appellee to give his version of the cause and incidents of that trouble, and perhaps to put in evidence so much of the letters as was then read. His testimony implies that he had read them before the trouble began. That she had read them would be presumed from the fact, if he states the truth, that they were found in her portfolio, and that she was angry that he had taken them. They were thus, upon his version, the prime cause of that trouble; and everything touching upon the trouble, present at it and affecting its character, was *res gestœ.*

The letters were of a very bad kind for a young married woman to have in her possession. They were susceptible of a construction very unfavorable to her, as to her relations with the writer. When the instructions are reached it will be necessary to say more about them.

The next exception to be considered is well taken. Henry Crawford testified that he, with his wife, occupied a room in April, 1884, in a hotel in New York. That the appellant occupied an adjoining room; that there was an ill-fitting door between the rooms; that his bed was placed against that door.

Then he testified to conversations and noises that he heard, the voice and words of the appellant, and is asked: " What was your conclusion?" to which he answered: " My conclusion from what I heard, that being the direct question put to me, was that there was an act of adultery committed by the persons in that room." This was error. But it does not necessarily follow that the decree is to be reversed for that error.

The doctrine that error which could do no harm is not cause for reversal, is familiar, and has been applied in a multitude of cases in this State. One of the later ones is Watt v. People, 126 Ill. 9, where the error on a trial for murder, followed by a sentence of imprisonment for life, was in admitting opinions in evidence. The facts on which the opinions were founded were before the jury, and from those facts the jury would necessarily form the same opinion. So here, if the jury believed Crawford's narrative, they would necessarily and inevitably concur in his conclusion. Stating that conclusion added nothing to the weight of his testimony, or the credence due to it.

It has been stated that the appellant testified on cross-examination that when she went to Europe in August, 1885, her mother gave her a part of the money she had then, and a part of it she had saved from time to time. On her behalf her mother had also testified in chief, as follows: " Do you know whether Mr. Carter supplied Mrs. Carter with money to go to Europe at that time in October, 1885?" " He did not." " Did you?" " I did. I gave her money. I had given her money at times after she left home." " Did you make any arrangements about supplying her with the necessary means while she should be in Europe?" " Do you mean the last time?" " I mean in October, 1885." "Yes sir, I did. I did so as far as I could." "What arrangements did you make?" "I gave her some money and—please ask me"— " That is sufficient for the present."

"If you remember any arrangement which you made about having her supplied with money while she was away, you may state it." Counsel for appellee: "An arrangement with whom?" Counsel for appellant: "Any arrangement which

she made." Counsel for appellee: "I object to that. If she gave her money I do not object to it." There the subject dropped without further discussion.

On her cross-examination this testimony was given: "You said that you gave your daughter money to go to Europe?" "I did, sir. I gave her money on occasions after her marriage." "When did you give your daughter money to go to Europe?" "I didn't give her money. I gave her money after, I knew she was going the last time." "You did not give her money to go when she went in August, 1885?" "I did not. I had given her money at times during the whole period of my stay in Chicago; given her various sums, various small sums." "I want to know how much you gave her." "What time do you mean?" "When she went in October, 1885." "I gave her a thousand dollars."

If we were reviewing the verdict of the jury upon the evidence, quotations at still greater length might be necessary. Now, from the testimony that has been stated or quoted, and from a very large mass of testimony by the appellant, her mother, and the maid, as to the condition of the appellant's health, the only proper inference—shutting out of consideration the fact that Mrs. Carter could not tell within $25,000 how much money she had in Europe, and seemed doubtful whether it was $60,000—is, that she went to Europe on account of her ill health, superinduced by appellee's cruelty, and her wants were supplied, so far as the source was disclosed, from her own savings, presumably not very large, and money that her mother gave her.

The reason for, or purpose in going, and means of her support while there, had thus been made, by her evidence, material in the cause. The appellee was not bound to let her version go to the jury as the true one, if it was not true. It was, therefore, competent for him to put in evidence tending to show that she was there leading a life of extraordinary extravagance, requiring a great deal of physical exertion, exposing her to changes of climate and vicissitudes of weather and bringing upon her, probably, considerable fatigue.

Upon this ground it was admissible to put in her letters

Carter v. Carter.

describing her travels; testimony of witnesses who saw her in Europe; evidence of enormous sums of money she had, and where they came from.   Depositions were read which showed that between her going in October, 1885, and her return in September, 1886, she had, if I have made no mistake in the accounts, about $23,000; and when she went again in the fall of 1886, she had $17,000 more.   By the same means it was shown that this money came to the bankers from William Constable.   Is that a probable story, so probable as not to need confirmation?   If it could be shown that William Constable were a doting grandfather, of enormous wealth, and that she was his sole heir expectant, to gratify whose whims and caprices was his greatest pleasure, would it not be admissible on her part?

If she may give a reason, or show circumstances from which a reason may be inferred, that such large gifts, being prompted by that reason, are not improbable, may not the appellee also give a reason, or circumstances from which a reason may be inferred, to support the probability of the tale he asks the jury to believe?   It is true that the fact that the money came manually from Constable was never denied, but at the time the evidence about to be discussed was put in, it could not be foretold whether it would be denied or not.

A deposition was read tending to show that, starting about six o'clock one summer morning in 1885, with no other company than a lunch basket, Constable and the appellant spent the greater part of the day together at a deserted lager beer garden on the other side of the lake from Cooperstown, N. Y., crossing the lake in a row boat.   If the jury believed that, the inference from it, and the connection it had with the money from him, were for them to consider.

There is another footing upon which the testimony last referred to, as well as testimony to which an exception was preserved—that in the spring of 1885, at Jacksonville, Florida, she was, by her own instructions, called at five o'clock in the morning to go riding—was admissible.   Many, and the worst of the charges of cruelty in the bill, were of a nature that there could be no direct corroboration of her testimony

in support of them. To such charges as the testimony of her mother and maid gave any support, times, places and circumstances were so stated, that there could be no direct corroboration of the testimony of the appellee in denial of them.

There is a vague, unexpressed, but implied theory running through the case on her part, that the fact of her continuous ill health is a corroboration of her charge that his cruelty was the cause of it. The testimony on her part was that both at Jacksonville and Cooperstown, her health was bad. Her case so presented the condition of her health that it was an issue. Whether her conduct was that of an invalid, or not, was, therefore, admissible in evidence. The cross-bill did not charge her with adultery in Europe with Deming, or with Constable. The admission of the evidence which has been discussed, must be justified under the issues made upon her bill, and her evidence in support of it, or not at all. The instructions will require a further reference to some of these matters. The depositions by which the many transactions were proved, are now objected to as not containing the best evidence of the matters. How long these depositions had been on file does not appear. No motion, before the trial, to suppress them, is shown. When offered they were objected to as "incompetent, immaterial and irrelevant," the phrase sometimes a little varied, but in substance the same. This objection is to the substance and not the manner of the proof.

To raise the question now presented, a motion, before the case was called for trial, to suppress, was essential. Such objections "should be made and disposed of before the trial, in order, if defective, the parties taking them may have an opportunity to remedy the objections, and, for such purpose, ask a continuance." T. W. & W. Ry. v. Baddeley, 54 Ill. 19, and see Kassing v. Mortimer, 80 Ill. 602.

It is therefore unnecessary to consider whether the objection could ever have been well taken. The case is so voluminous and the exceptions so numerous that minor points must be passed over with only the assurance that they have been considered. The appellant's counsel will doubtless concede that if I am right in what I say, I have not gone wrong where I am silent.

Carter v. Carter.

It may be admitted that after the evidence as to the money and Constable had come in, considering the collateral influence of that evidence upon the issue on the cross-bill of the appellee, the testimony offered and rejected on her re-direct examination, as to her belief in reference to the source from which the money came, would have been competent, but it—that is, her belief—was not again offered.

The appellant did put in again testimony of the wealth of Mrs. Constable; that she was childless and fond of the appellant; and offered to prove by the mother of the appellant that Constable had no means in his own right, and arrangements made with them to furnish Mrs. Carter with money in Europe. The argument in favor of the admission of this evidence is very plausible, but delusive. It proceeds upon the supposed natural order and sequence of events.

First: Mrs. Constable was able to furnish the money. Second: She said she would do it, and therefore she was willing. Third: He was not able. *Ergo,* when money came through his agency (action) it is a fair inference that he acted only as the agent of his wife, and that it was her money that came. Whenever an inference is to be drawn by a jury, for or against a party, the facts and circumstances from which it is to be drawn are material and traversable. The appellant and her mother might have such means of knowledge that Mrs. Constable was rich as would make their testimony to that competent. But the second essential, that she was willing, could not be proved by anybody but herself. Leave out of view the consideration that she might change her mind; the then state of her mind could not be proved by her declarations, there being then no act done, the character of which was to be affected by it, and the appellee claiming nothing under her. Such declarations come within none of the exceptions to the general law of evidence. The appellee " was entitled to have all evidence against him given upon oath, and the witnesses subject to cross-examination." Roche v. Day, 20 Ill. App. 417, and cases there cited. Even if it were made to appear that she was able and willing, it is not possible, in the nature of things, that either the appellant or her mother could know

that Constable himself had no means of his own right. Exe-cutions running to the county of his residence, returned *nulla bona*, might raise a presumption of insolvency; or if he were living in want, suffering privations that money would relieve, it might be inferred that he was poor. But in such cases the facts must be proved to the jury for them to draw the conclusion. The best possible source of knowledge by these witnesses would be what they had, in conversation, heard Constable say. This would not be a competent source. Roche v. Day; 20 Ill. App. 417. " The rule, therefore, in the absence of special tests of truth, operates to the exclusion of all the acts or declarations or conduct of others, as evidence to bind a party, either directly or by inference; and in general, no declaration, or written entry, or even affidavit made by a stranger is evidence against any man." Starkie, 84.

The supposed arrangements with the Constables were not transactions which had an operation *in rem*—which had a present legal operation and consequence (Starkie, 86)—like the sale of a horse, or the acceptance of a chattel as accord and satisfaction, but, if made, were wholly executory, and might have been induced by motives independent of, or even in opposition to, the truth of the facts sought to be inferred from them. Starkie, 84. This matter of admitting testimony of arrangements between the Constables and the appellant, or with her mother, for the supply of funds to the appellant while in Europe, is treated both by Judge Moran and myself as being of an importance which it does not deserve. Whether testimony is competent does not depend upon its credibility, but in determining whether a technical error, if one were committed, by its rejection should be a cause for reversal of the judgment, it is a fair inquiry whether the testimony ought to, or fairly might, have been believed if admitted.

If, after the evidence of the summer day outing with Constable—with no reason for the absence of the testimony of both of the Constables offered, or possible to suggest, except that either they did not desire to commit perjury, or feared a cross-examination—the testimony had been admitted, would any chancellor or judge, sitting without a jury, have heeded it?

One of the reasons given by Starkie (page 57, 10th Ed.) for the rejection of such hearsay evidence is, " in addition to this, he may have been induced to misrepresent facts on the particular occasion, under the influence of indirect motives, which, without the opportunity of cross-examination, it is impossible to trace or even surmise." Apply that reasoning to this case. If the deposition of Mrs. Gray is true, there was a scandal to be hushed up. A rich wife, whose money had procured an unfaithful husband, might not care to have the world know that she had made a bad bargain and not got the worth of her money.

If she did furnish the money from proper motives, why does she not come out on the witness stand and swear to it? If Constable acted under his wife's directions, why does he not face a cross-examiner? Imagine either of them under cross-examination, and unable or unwilling to deny the matter stated by Mrs. Gray, and that Mrs. Constable knew of it, when the appellant returned from Europe in September, 1885.

The letter of Mrs. Constable, written after the last return of the appellant from Europe, to the mother of the appellant, is not made evidence by the fact that it came to the knowledge of the appellee. Not what was represented to him, but what was the truth, was the issue. It is worthy of note that while the case of the appellant on her bill was being put in, it is obvious that her able and experienced counsel did not regard the alleged prior arrangement with Mrs. Constable as competent evidence of the source the money came from. As has been seen, they offered the testimony of the appellant on that point only in support of her belief as to, and not as evidence of the fact of the source, and on the examination of her mother, when objection was made, they yielded to the objection without any contest.

April 9, 1889, the appellant gave notice that a commission to take depositions would be sued out on the 20th; the trial begun on the 16th. The appellee then had the whole of the next day to elect whether he would examine the witnesses orally, under Sec. 28, Chap. "Evidence." Of this election he could not be deprived, nor required to leave the trial in order

to exercise it.  Hankinson v. Lombard, 25 Ill. 468.  If the evidence relating to Deming and Constable was properly admitted, all other questions in the case sink into insignificance when compared with those the appellant raises upon instructions asked by her and refused by the court, as follows:

" 7.  The jury are instructed to disregard all the evidence in this case in regard to money transmitted by any person to said Caroline Louise Carter, while in Europe, and not to apply any of said evidence in determining any of the issues in this case upon the cross-bill of said Leslie Carter."

" 8.  The jury are instructed that no inferences or conclusions of criminal or improper conduct on the part of the said Caroline Louise Carter should be drawn from any of the evidence in this case as to money transmitted to her while in Europe."

" 9.  The jury are instructed that the evidence in this case in regard to money transmitted to Caroline Louise Carter while in Europe is not relevant to any of the issues in the case, and should be disregarded by the jury in determining the issues."

" 11.  Even if the jury believe from the evidence that William Constable, Jr., transmitted money to Caroline Louise Carter, while in Europe, they are bound to regard such transmission of money as being done for a proper purpose, and not on account of any improper or criminal relations existing between said Caroline Louise Carter and said Constable."

" 13.  The jury are instructed that the evidence concerning the letters claimed to have been written by Deming, can only be applied by them in determining whether or not they were the cause of the occurrence described in the evidence at the Fifth Avenue Hotel in the month of November, 1884, and for no other purpose."

These instructions ask that the operations of the mind of man stop in the consideration of this case.  It must be borne in mind, that if the evidence referred to in these instructions was properly admitted, it was done upon issues made by her, in reply to allegations and testimony in support thereof in her bill; and she having made it competent in the cause,

Carter v. Carter.

there is no rule of law that requires the jury to disregard its legitimate, though collateral, tendency.

There was during the trial a persistent effort to get before the jury the wealth of Mrs. Constable and her affection for Mrs. Carter. The record shows that it was before the jury that the Constables were people accustomed to travel. Their absence as witnesses on the trial or by deposition, when the narrative in which they had such a strong interest had been made public by depositions on file for a period not shown, was a circumstance not accounted for, and which the jury could hardly fail to observe, even if it was not commented upon by counsel.

The jury may have believed the version of the appellee as to the Deming letters; and that the version of the appellant of the trouble at the time of the water throwing was on her part a fabrication—an effort to forestall the truth. If Deming could not be produced to deny the letters first made public on the trial, no such reason could be urged why the best evidence as to the relations with the Constables was not forthcoming. All the unfavorable inferences which may be made against a party not presenting the best accessible evidence, or failing in an attempt to give a false account of material circumstances, the counsel of the appellee were at liberty to urge upon the jury. It is scarcely possible either to overrate or belittle the collateral influence of the Constable episode. Believed, it reflected probability upon the specific charges in the cross-bill; and the $49,000 in money, supplied within a period of less than eleven months, is a fact so extraordinary in itself, that the jury having but one explanation of it, would almost inevitably accept that.

This opinion is already too long. The other instructions are of little importance, if these were rightly refused. There is but the one technical error in admitting Crawford's conclusion, but it could have had no effect upon the result. The decree, in my judgment, ought to be affirmed. Judge Moran comes to an opposite result. The questions of law on this record are so numerous, and some of them so unusual, that the time that Judge Garnett remained in this court after sending his resig-

nation, was too short for a full consideration of them. The case remains for us to decide. We disagree and the decree is thereby affirmed.

*Decree affirmed.*

MORAN, J. For the purpose of such discussion of this case as is deemed necessary on this appeal, it will be assumed that the evidence is such, that if no error had intervened, a verdict in favor of either party on any or all of the issues presented and tried, would not be disturbed on review. This brings us at once to the inquiry, whether such error is shown to have been committed against appellant as requires a reversal of the decree and a setting aside of the verdict on which it was based. Appellant's bill charged cruelty, alleging various specific acts, and as a part of the history of the relations between herself and her husband, and of his conduct toward her and lack of consideration for her, she alleged that when in October, 1885, her health was broken down, and she went to Europe by the advice of her physician, the defendant, though a man of large means, failed and refused to furnish any portion of the moneys necessary for the support of complainant during her trip and sojourn in Europe, and that complainant was obliged to sell her wardrobe to defray part of her expenses, and to rely upon means derived from her mother and a lady friend for her support while so in Europe. Appellee did not in his answer claim that he did furnish her money for her trip to and support in Europe, but did deny that he was a man of large means, and that he " refused to furnish money necessary to support his wife, and denies that complainant was obliged to sell her wardrobe to defray part of her expenses and to rely upon means derived from her mother and a lady friend for her support in Europe." The issue as thus formed on this particular allegation of the bill, was not a material one. As it stood on the pleadings, her allegation that he failed to furnish money for her trip to Europe was not denied, his denial of the matter alleged only controverting that he was a man of large means, and that she was obliged to sell her wardrobe to defray part of her expenses, and to

rely upon her mother and a lady friend for her support in Europe. This was merely an incidental issue. A finding upon it either way would determine nothing in the case, yet as the case was tried the evidence introduced in support of his side of it by appellee became a crushing weight, bearing appellant down on other and material issues made by the pleadings. There were in appellee's cross-bill charges that appellant had committed adultery with various persons, specifically at Cooperstown, New York, in August, 1882, with some persons unknown, in August, 1883, at Cooperstown, with one James F. Pierce, in the month of April, 1884, and at other times unknown in New York City, with one James B. Gilbert; in September and October, 1886, at New York City with one Kyrle Bellew, and at several different places in Europe with persons to cross-complainant unknown. The various charges were with less detail set up in appellee's answer to appellant's original bill.

They were all specifically denied in appellant's answer to the cross-bill. The issue standing thus, appellant, when on the stand, did not in her direct examination make any statement as to the sale of her wardrobe, or as to the source from whence she obtained money for her support or expenses when in Europe. She merely related a conversation which she said she had with appellee the day before she left for Europe, in which she says, "I told him I intended to support myself in whatever way I could, get employment if I could. He did not offer me any money then, and he did not ask me any questions as to what money I had."

She did testify on direct examination that her health was broken down, and that she went to Europe by the advice of a physician, for the purpose of recovering her health. This latter evidence made it proper to cross-examine her as to her mode of life in Europe, and as to the amount of money received and expended by her for the purpose of showing that she lived extravagantly and lavishly, and not in a manner of one suffering from ill health.

In answer to questions she stated on cross-examination that she received no money while absent in Europe from her husband; that she had money but could not tell within $25,000

how much, and did not know that an amount over $60,000 was remitted to her from New York between October, 1885, and November, 1886. She said she had money and it must have been sent to her from New York; always had a letter of credit. From further cross-examination it appeared that she purchased carriages and very costly apparel while in Europe, and in a general way that she expended large sums of money. This evidence, if left unexplained, had an injurious tendency, beyond that of showing that appellant was doing Europe luxuriantly, extravagantly and gaily, and not in the manner of an invalid. To show that a married woman who is living away from her husband, and who has not an estate of her own, is spending money lavishly, that it is admitted does not come from her husband, or her relatives, is to raise an unfavorable presumption against her.

Whenever on cross-examination evidence is brought out that will warrant an injurious inference against the witness, it is simple justice to permit on re-direct the statement of any facts by way of explanation which will rebut such inference. Such a rule is necessary to the ascertainment of truth, and a contrary rule would leave the character of every witness at the mercy of the cross-examiner.

Here the witness was also the party, and it was charged against her in the answer to her bill for divorce and in the cross-bill that she had been guilty of various adulteries. She had the right to give, and from the nature of the case, it was important that she should be allowed to give, her understanding of the source from whence the money came to her.

She was asked on cross-examination if she knew where the money came from, and she answered that she did, but she was not asked to tell where it came from. On re-direct appellant's counsel sought to show that Mrs. Constable, who resided in New York, was a wealthy lady in her own right, and was childless, and who knew of appellant's troubles, to whom appellant had related her troubles, became interested in her, and agreed to assist her financially on her trip; that, as appellant understood, such assistance was to be sent through the banks, and that when it came from the bank it was to be a full

verification of what appellant understood Mrs. Constable was to do, and received the money with that understanding. This evidence was objected to, and counsel for appellant stated to the court that counsel (for appellee) "wants to draw the inference, because she received money, not from her mother, that it was from somebody for improper purposes. Now we propose to show that she related her troubles to Mrs. Constable; that Mrs. Constable told her that she would aid her," and that at the time she was receiving the money she understood it came from Mrs. Constable.

The objection was sustained and the evidence excluded. It is sought to support this ruling on the ground that there was no issue in the case as to her belief as to where the money came from. But there was, in fact, no other material issue in the case as to the money, except the issue as to her belief as to who furnished it. She admitted receiving a large amount; there was no issue as to that.

There was, as already said, no *direct* issue in the pleadings on this money matter at all. The denial is of her allegation that she was *obliged* to rely upon means derived from her mother and a lady friend for her support while in Europe. But it was not upon this issue that cross-examination as to the amount received or spent by her in Europe was admissible, but to bear upon her claim that she was an invalid. While it was competent for appellee to show that she was enjoying herself extravagantly while in Europe, and for that purpose to show a lavish expenditure of money, it was just as competent for her to ward off any inference that might be drawn against her virtue, by showing that when she received and spent the money, she understood and believed that it came to her from her lady friend. When, on cross-examination, facts are called out which tend to create distrust of the virtue, fidelity, integrity or truth of the witness, it is entirely competent on re-direct, to bring out from the witness any explanation which may show that the facts thus elicited were, in truth, wholly consistent with his or her virtue, integrity, fidelity and truth. U. S. v. Barrels, etc., 8 Blatch. 475.

But it was not alone in rejecting this evidence on re-direct

that the court erred in reference to the receipt, by appellant, of this money in Europe, nor was it from this ruling that appellant's case suffered most.

In the progress of the trial, the testimony of a witness taken in behalf of appellee was read, tending to show that appellant and one William Constable, Jr., went out rowing on the lake, at Cooperstown, N. Y., at about six o'clock in the morning, taking a lunch with them, and going across the lake toward a deserted lager beer garden, on the opposite side of the lake from Cooperstown. Then, at a later stage of the proceedings, and after evidence had been introduced tending to show that appellant had been guilty of adultery with four different men, with two of them at Cooperstown, and with two others at New York, certain testimony was introduced showing the accounts of appellant with Baring Bros. & Co., of London, and showing cable transfers and drafts by the firm of Kidder, Peabody & Co., of New York, to Baring Bros., in favor of appellant, and by other New York firms, in favor of appellant, all tending to show that there was forwarded to appellant, while in Europe, nearly $50,000, and that said money came to the banking firms that transmitted it from William Constable, Jr.

Now, there was no charge of adultery with Constable in the cross-bill or in the answer, and the only ground on which the evidence tending to show that appellant went rowing with him upon the lake, was admissible, was for the purpose of contradicting appellant's statement, that at that time in Coopers-town her health was very bad, and she was extremely nervous and generally in a very bad way. The proof of the amount of money sent to her in Europe was admissible only for the same purpose that cross-examination of her on that matter was competent, that is, to show that while in Europe she was leading a life of active gaiety and luxuriant extravagance, requiring physical endurance and exertion, instead of being the weak and suffering invalid that she claimed to be. It was the fact that a large amount of money was received and used by appellant while in Europe that appellee was entitled to prove, and not the fact that money was sent by

Constable.   Of course, in proving that money was sent, it became necessary to show how and by whom it was sent, but the proof of who sent the money was admissible simply and only because it was incidentally necessary in proving that the money was sent.   On rebuttal appellant sought to avoid the influence which the fact that this money came to her from Constable would have on issue of the cross-bill, by introducing evidence tending to show that the money sent was not in fact the money of Constable but was that of Mrs. Constable.   It was shown, without objection, that Mrs. Constable was a lady of wealth, that she was childless and that she was a friend of appellant and her mother, Mrs. Dudley, and that appellant's mother, before appellant went to Europe in the fall of 1885, saw Constable and Mrs. Constable together in New York. Then this question was asked.

" I ask you to state, Mrs. Dudley, what arrangement, if any, you made with them at that time with respect to furnishing Mrs. Carter with money ?"

The question was ruled out by the court, and an exception taken by appellant.

After some discussion between the court and counsel for appellant, counsel attempted to state what he offered to prove, but the court interrupted him with the statement—" Your question shows what you offer to show."

It was, and is, very manifest from the question and the context that counsel was seeking to prove an arrangement made with Mr. and Mrs. Constable to furnish to Mrs. Carter money for the expenses of her trip to and support in Europe.   Was evidence of such an arrangement competent ?   Why not ? Suppose a written contract was offered in evidence between Mr. Constable and Mrs. Dudley in and by which he undertook and agreed to send to appellant at London, from time to time, during the year following September, 1885, sums of money corresponding in amount with those which he actually did send, no other reason for his sending the money being shown, would not the inference be irresistible that he sent it in pursuance of the contract, and would not the contract be admissible to raise that inference, in avoidance or rebuttal of any

other inference that might be drawn from his sending it?
There can be but one answer. It is plain, too, that if such a
contract with him would have been admissible for such pur-
pose, then a similar contract with him and his wife would be
admissible for the same purpose. I must conclude that the
question was a proper one, and the evidence sought to be
elicited by it admissible.

Mrs. Dudley was a competent witness to prove any ar-
rangement made with Constable or with Constable and his
wife to send money to appellant, and a promise made by Mrs.
Constable in the presence of her husband that money should
be sent, might well have been admitted on the same reason-
ing for the purpose of inducing the inference that the money
that was sent to appellant by the hands of Constable, was not
wrung from him as blackmail, or received as the price of past
or future favors. It must be noted here that the pith of this
matter relates to the reason why money was transmitted to
Europe for appellant by or through Constable, and the under-
standing and belief with which she received and used it.
Appellee's hypothesis was that she was furnished the money
she so lavishly spent in Europe by a paramour, and the proof
of this hypothesis is found in the fact that the money which
purchased drafts in her favor was handed to the transmitting
bank in New York by Constable. Her hypothesis was that
the money was sent by Constable, acting for his wife, in fulfill-
ment of the wife's promise that she would send her money,
or in pursuance of an arrangement made by Mrs. Constable
and Mr. Constable that the money should be sent. The
promise of the wife and the arrangement with the husband
and wife were clearly relevant in support of her hypothesis
and in opposition to his.

Wharton defines relevant evidence as that which conduces
to the proof of a pertinent hypothesis; and Thompson says in
his work on Trials, Sec. 389, "It is sufficient, in order to make
a question relevant, that the answer which it seeks to elicit
will tend in some sensible degree to prove or disprove the
fact in issue. It is not necessary that the answer, if believed,
should in itself afford complete proof," and he quotes Stephen

to the effect that by relevant evidence is meant evidence which, according to the common course of events, either taken by itself or in connection with the testimony, proves or renders probable the past, present or future existence or non-existence of a disputed fact. It was, then, error to reject this evidence, and the error was repeated when appellant was placed on the stand in rebuttal, and she was interrogated as to a promise by Mrs. Constable to send her money.

Appellant having been denied the introduction of her evidence tending to show that the receipt of money by her while in Europe, which the accounts and drafts evidencing the transaction showed came from the hands of Constable, was not for an improper purpose, or because of any illicit relations between her and Constable, sought by instructions to have the court limit that evidence in its consideration by the jury to the issue on which it was introduced, to wit, to the issue made on the original bill. In that view the court was asked to give, among others, the following instruction:

"The jury are instructed to disregard all the evidence in this case in regard to money transmitted by any person to said Caroline Louise Carter while in Europe, and not to apply any of said evidence in determining any of the issues in this cause upon the cross-bill of said Leslie Carter."

As has been said before, during discussion, the evidence as to the money in Europe, and also the evidence as to rowing on the lake, was admissible in contradiction of the allegations in appellant's bill and the evidence introduced in support of said bill, and was not admissible in support of the allegations of the cross-bill. There was no charge in the cross-bill of adultery or improper conduct with Constable, and evidence tending to show adultery with one person is not admissible in support of charges of adultery with another or with others, nor is it competent to prove improper or equivocal conduct with a person with whom adultery is not charged, to show general inclination or general misconduct. Beadleston v. Beadleston, 2 N. Y. Suppl. 809; Stevens v. Stevens, 8 N. Y. Suppl. 47.

The evidence being proper for one purpose, was admissible,

but having an injurious tendency with reference to issues on which it was not proper to consider it, the court should have limited its application by instructions when so requested.

"It is sometimes proper and even necessary for the court to instruct the jury as to the purpose for which particular evidence has been introduced, admonishing them to confine the application of the evidence to such purpose." Thompson on Trials, Sec. 2416, citing Kelly v. The State, 18 Texas App. 262; People v. Gray, 66 Cal. 271.

The result of the refusal by the court to give the instruction asked was to leave the jury free to consider the evidence of the Constable transactions as applicable upon the charges in the cross-bill. Appellee's counsel evidently intended that it should have that application, and to aid the jury in making that application and drawing the injurious conclusion desired, they made an issue with appellant as to Constable's age, introducing evidence to show that he was not more than forty-five instead of being sixty-five as she had testified.

She had denied the specific charges of adultery and the facts tending to prove each of them, and as to each charge there was a conflict of evidence; but the receipt of the $49,000 from Constable during the eleven months of the stay in Europe, she did not attempt to deny, but sought to explain, which was not permitted; taking that in connection with the rowing on the lake to the deserted beer garden, with a man of middle age, of whose attention to her, her husband had, as he testified, complained, it will readily be concluded that a jury left at liberty to so apply this evidence found in it very strong support for the specific charges in the cross-bill.

The discussion of the evidence will not be further pursued. Enough has been said, it is believed, to show the errors of the court in relation to it, and to make it clear that such errors were seriously injurious to appellant.

But one other of the errors assigned will be considered. Mr. Henry Crawford, a witness called by appellee, testified that he occupied, with his wife, a room, in April, 1884, in a hotel in New York, adjoining a room at that time occupied by appellant. Conversations that he heard between appellant

and one Dr. Gilbert during the night were related by him, and noises and movements that he heard were described, and then he was asked the following questions and gave the following answers, against the objection and exception of appellant's counsel.

"Q.    Mr. Crawford, I will ask you this question: Whether or not Mrs. Carter and Dr. Gilbert on either of those evenings committed the act of adultery within the room?"

'A.    My only answer to that is, not being in that room, that I can only answer what my impressions were or conclusions from what was said and what I heard.'

"Q.    What was your conclusion?"

"A.    My conclusion from what I heard, that being the direct question put to me, was that there was an act of adultery committed by the persons in that room."

This was manifest error. "It is for the jury and not for the witnesses to draw inferences from facts, and therefore it is a general rule that witnesses who are not testifying as experts are not permitted to state their opinions, conclusions or deductions from facts, but they must be confined to the communication of facts simply." Thompson on Trials, Sec. 377.

No time will be spent in demonstrating that the evidence did not fall within any of the exceptions to the foregoing rule. Cases hereafter cited will incidentally serve that purpose. It is contended that the error in admitting this testimony did no harm; that the facts on which the conclusion of the witness was based were stated to the jury and that if the jury believed the narrative they would inevitably concur in the conclusion stated by the witness.

A long line of decided cases show that the courts will almost invariably reverse for such an error, and in many of the cases reversed it will appear that the testimony had less tendency to injure than that here admitted.

The statement to the jury of the facts on which the conclusion was based, would be less likely in such a case as this, than in most others, to obviate the objection to the statement of the witness' conclusion. The facts consisted of such words and

sounds as the witness heard in an adjoining room. The testimony was given some years after the occurrence to which it relates.

The jury might readily believe that the witness was mistaken as to some of the words or sounds, or that his memory might have served him a trick, and that he unconsciously substituted one word or sound for another, and that he might have entirely forgotten some of the circumstances, which, though slight, might have thrown light on the subject, or they might have accepted circumstances testified to by appellant and her witness as explanations of some of the circumstances which Mr. Crawford testified to. Then the subject was an indelicate one, and the natural reluctance of a witness to store up in the mind and detail with minuteness all the sounds and words and movements which led him to the conclusion that such an act was performed, would be understood and felt by jurors. They would recognize the inclination based on modesty to leave something of the detail to the imagination, and thus be more likely to attach importance to the sworn opinion of the witness that the act was performed, and to rely upon his conclusion, instead of drawing from the facts and circumstances as independent conclusions of their own.

In City of Chicago v. McGiven, 78 Ill. 347, the opinion admitted was that glass was unfit and unsafe to be used as a part of a sidewalk. The court held the opinion of witnesses should not be received as evidence where all the facts on which such opinions are founded can be ascertained and made intelligible to the court or jury; that the question whether glass was unsafe because of the smoothness of its surface, was easily determinable by the jury upon a description of the manner of its use in the sidewalk being given by witness, and it was said that "the not unprobable effect of obtruding upon the jury the opinions of these architects that the glass was unsafe, might be that the jury would regard them as deciding the whole question, and so accept them, and repose on them as such without further inquiry and deciding for themselves whether the sidewalk might not have been reasonably safe." There the jury had the facts

before them, and the Supreme Court held that they were capable of determining, but reversed the case because the opinions were admitted.    In C. & A. R. R. Co. v. S. N. W. R. R., 67 Ill. 142, it was held reversible error to introduce the opinions of witnesses in such a way as to cover the very question to be found by the jury.    To do so, is to permit the witness to usurp the province of the jury.    There also the facts or the method of construction was in evidence before the jury, from which it was claimed no damage to the land would arise.    The case was reversed.    It is very clear that the witness here gave his opinion on the very question which the jury were to determine, and that the verdict might be the mere recording of his finding from the facts.

The case of Watt v. The People, 126 Ill. 29, is one that holds that the admission of incompetent opinion evidence was a harmless error, and not such as to require a reversal; but the opinion there held harmless was very different in its purpose and effect from that now being considered, and the case clearly distinguishes between injurious and harmless opinion evidence.    The complaint there was that two witnesses were allowed to swear that in their opinion two specimens of hair shown to them exactly resembled each other.    There was no pretense or claim by either party that the said hair came from the heads of either of the defendants on trial.    The court says: "While we are of opinion that the evidence was incompetent, it being no case for expert testimony, we are unable to see how any material prejudice can have resulted to the defendants from its admission.    It was not offered as inculpatory evidence, and could not have had that effect, as it had no tendency to prove that either of the defendants committed the homicide.    Nor are we able to perceive how it could have any material tendency to rebut any exculpatory theory which the defendants could legitimately base upon any evidence in the case."    The court distinguishes the evidence admitted from that under consideration in Knoll v. The State, 55 Wis. 249, and shows that the evidence there was inculpatory in its bearing, and its admission was, therefore, held to be an error sufficiently grave to require a reversal of the judgment.

The case of Knoll v. The State is an apt illustration to show that the opinion permitted in evidence in this case is reversible error.

The hair found upon a wheelbarrow belonging to the defendant, and in which it was claimed he had conveyed the body of the deceased, was compared with hair taken from the head of deceased, and a medical expert was asked to state, and did state, under objection, the result of his comparison, which was that the two specimens of hair came from the head of the same person. The court said that the comparison required no peculiar or expert skill; that the jury were as competent from the description of the hair given to draw the conclusion whether it came from the same person, as was the witness. "That conclusion was the precise fact which the jury were called upon to determine. It is not entirely clear from the record whether the hair taken from the skull and that found on the wheelbarrow were before the court and jury, though we infer such to be the case. If so, it is obvious the jury could make the comparison for themselves, for the resemblance or marks of similarity were obvious. But if we are mistaken in this supposition, the hair in both instances had been so fully described, the points of resemblance or identity had been so fully given, that the jury could draw their own conclusions as to whether it came from the head of the same person or not. * * * We think it was clearly incompetent, and must work a reversal of the judgment." It would seem that an opinion on hair which was before the jury, and which the court said they were as competent to determine about as the witness was, would be as nearly harmless as opinion evidence could be, yet the judges of the Supreme Court of Wisconsin would not take it on themselves to say that it did no harm, when it was on the very point on which the jury had to conclude. See, also, Noonan v. The State, 55 Wis. 258.

In The State v. Crawford, 39 Kansas, 257, the testimony admitted was very similar in character and circumstances to the evidence now being considered. There the point to be proved was criminal intercourse, and after a witness had

described the sounds she heard in a room overhead, she was allowed to state her conclusion as to what had taken place. The court held that the admission of the opinion was error; that the jury were to judge for themselves from the facts testified to, and the case was reversed.

McKnight v. The State, 6 Tex. App. 158, was also a case where the fact to be proved was adultery. A witness was allowed to state the conclusions he drew from facts which he had observed, and which facts he stated to the jury. The court said : " We believe that the court erred in allowing the witness Contrell to state what impressions were made upon his mind by the conduct of the defendants. A judgment, even in a criminal case, will not be reversed for immaterial errors. In such cases, however, courts will rarely presume that the particular evidence which had been wrongfully admitted, could have no influence on the deliberation of the jury." In Cox, Adm'r, v. Whitfield, 18 Ala. 738, the case was *crim. con.* and a witness was allowed to state his opinion relative to the question which the jury were to pass on, and the court for that error alone, and without looking further into the case, reversed the judgment. Cameron v. The State, 14 Ala. 549, was an indictment for living in adultery, and the court considered the question whether such opinion evidence, which was admissible in ecclesiastical court (Crewe v. Crewe, 3 Pag. 123), where the hearing was before the chancellor, could be admitted in a trial under an indictment for adultery, and concluded that " in such a case, witnesses must testify to facts, and the jury must consider them and pronounce such verdict as their opinion convinces them is proper," and the case was reversed for permitting a witness to express his opinion as to the guilt of the defendants.

These were criminal cases, it is true, involving punishment; but can it be urged that a looser or more unsafe rule is to obtain where the inquiry related to the chastity of a woman, and in such case that she is to be consigned to social infamy as an adulterous wife, on testimony for the introduction of which a conviction against an alleged seducer would be reversed ?

I express no opinion on the merits of this unfortunate con-

troversy.    It is no doubt for the general advantage of society
and of the parties directly interested, that such cases should
be speedily and finally determined, and this consideration
should have due weight with a reviewing court, but I do not
feel at liberty to go so far as to sustain a verdict obtained
under erroneous rulings, to save trouble, expense and delay,
unless we can say that it is our conviction that the errors com-
plained of had no influence in producing the result.    As a
matter of law, appellant has the right to have her case deter-
mined without being unjustly prejudiced by the admission of
incompetent evidence against her or the exclusion of compe-
tent evidence offered in her behalf.

She should not be compelled to rest under an adverse ver-
dict on the issues made unless it results from a trial free from
substantial errors.    It is impossible to conclude that the errors
pointed out did not affect the result, and I am therefore con-
strained to say that the verdict should be reversed and the
case remanded for a new trial.